**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Curtis D. ABLES (96–6715) and Jackie Lamkin (96–6643), Defendants–Appellants.**

Nos. 96–6643, 96–6715.

United States Court of Appeals,
Sixth Circuit.

Argued and Submitted June 9, 1998.

Decided Feb. 12, 1999.

Terry M. Cushing (briefed), Assistant U.S. Attorney, Marisa J. Ford, Office of the U.S. Attorney, Louisville, Kentucky, for United States of America.

G. Murray Turner (briefed), Paul A. Casi (argued), Mulhall, Turner & Hoffman, Louisville, Kentucky, for Curtis D. Ables.

Fred R. Radolovich (briefed), Radolovich Law Office, Louisville, Kentucky, for Jackie Lamkin.

Before: BATCHELDER, DAUGHTREY, and GILMAN, Circuit Judges.

GILMAN, Circuit Judge.

Curtis D. Ables and Jackie Lamkin were convicted by a jury on various federal charges arising from their operation of a bingo hall in violation of Kentucky law. Lamkin appeals from her convictions solely on the basis that 18 U.S.C. § 1955, which prohibits the conducting of an illegal gambling business, is unconstitutional. Ables, who also challenges the constitutionality of § 1955, puts forth numerous additional grounds to vacate his convictions and prison sentence. For the reasons set forth below, we **AFFIRM** the convictions of both Ables and Lamkin, and further **AFFIRM** Ables's prison sentence.

## I. BACKGROUND

In 1989, Ables began renovating a facility in Louisville, Kentucky for the purpose of establishing a bingo hall known as Castle Bingo. Lamkin, Jackie Baxter, and Virginia Bennet, each of whom Ables met through an advertisement that he placed in a bingo periodical, assisted him in opening the bingo hall. Castle Bingo opened in January of 1990 and operated until February of 1992.

During its operation, Castle Bingo conducted bingo sessions seven days per week, three sessions per day, with each session consisting of 30 bingo games. Castle Bingo operated under the guise that bingo proceeds earned on any particular day would be donated to one of several organizations exempt from tax under I.R.C. § 501(c)(3), including Shelby Community Center, the Fairdale Lions Club, Grassroots Community Outreach Group, the Clarksville Little Theater, and the Borden Volunteer Fire Department ("the organizations").

The organizations, however, did not receive the net proceeds from any particular bingo session. Rather, Castle Bingo provided donations to the organizations at irregular intervals for amounts in round figures that varied dramatically. To be eligible for such donations, the organizations were required to provide Castle Bingo with a government-issued "tax-exempt" identification number. Castle Bingo would then file quarterly accounting reports with the Jefferson County Clerk on behalf of the organizations. Those reports usually indicated that the organization in question was losing money through its operation of bingo at Castle Bingo.

Representatives of each of the organizations testified that they had no involvement with the conducting, promoting, or administering of bingo activity at Castle Bingo. Furthermore, the representatives testified that they had no access to Castle Bingo's books and records and lacked any knowledge of the manner in which Castle Bingo operated or the amount of money that the bingo activity generated.

The evidence at trial indicated that Ables controlled significant aspects of the bingo activity at Castle Bingo. Representatives of the organizations testified that they met personally with Ables prior to receiving donations from Castle Bingo. Moreover, Phil Dalton, who worked at Castle Bingo as a seller of pull tabs, testified that "Mr. Ables ran the bingo hall." Dalton described Ables's activities as follows:

I saw Mr. Ables tell us what to do, tell [Lamkin] to tell us what to do. I saw Mr. Ables telling what programs to play, how much to pay out, what was going to be, what nights were going to be played.

Dalton testified further that he left his employment with Castle Bingo in part because Ables had become "[a]bsolutely tyrannical." In addition, the jury heard testimony from Charles Mattingly, who also worked at Castle Bingo as a seller of pull tabs. When asked to describe Ables's role at Castle Bingo, Mattingly responded that "[h]e run [sic] the place."

In addition to the bingo activity, Ables established and administered a concession stand and a check-cashing service on the premises of Castle Bingo. He maintained the following three accounts at Liberty National Bank & Trust Company ("Liberty National"): (1) the "Castle Leasing" account, into which he deposited checks for rental of the hall; (2) the "Castle Bingo" account, used for income and expenses in connection with the concession stand; and (3) the "Curtis Ables d/b/a CCA" account, into which he deposited fees charged for cashing checks.

Lamkin, Baxter, Bennet, and Leslie Sean Cosgrove comprised the office staff of Castle Bingo. In that capacity, they maintained daily accounting ledgers, counted money, wrote checks, and deposited bingo proceeds into one of seven accounts maintained at Liberty National. The accounting ledgers, which were prepared for each of over 1,500 bingo sessions, contained information regarding the number of players in attendance, the receipts from the sale of bingo cards and pull tabs, the payouts for prizes, expenses for rent and paper, and a bottom-line figure that presumably constituted the amount available for a bank deposit. Many of these ledgers indicated that Castle Bingo was losing money.

In February of 1992, the Special Investigations Division of the Internal Revenue Service ("the IRS") executed several search warrants in connection with its investigation of Castle Bingo. A search of the bingo hall revealed approximately $454,000 in cash and many financial records. A search of Ables's home revealed approximately $128,000 in cash, along with receipts and other financial records. Furthermore, the IRS seized approximately $229,000 from the checking accounts maintained at Liberty National.

According to the records kept by Lamkin, Baxter, Bennet, and Cosgrove, Castle Bingo had gross receipts of $3.6 million during its operation. Of that amount, the organizations received just over $256,000. An additional $200,000 was contributed to local high schools. Proceeds were also used to pay rent, utilities, and other personal living expenses of individuals who requested assistance from Castle Bingo, but were not affiliated with any charitable organization.

Special Agent Robert Duncan of the IRS testified at trial that during Castle Bingo's operation, Ables's net worth increased by over $800,000, and that approximately $600,000 of that figure was based on tangible assets purchased with cash. Duncan testified that he traced the deposits and checks on each of Ables's three checking accounts and determined that about $500,000 of Ables's $800,000 increase in net worth could not be accounted for from his leasing, concession, and check-cashing income. The government offered Duncan's testimony as evidence that Ables skimmed the bingo proceeds of Castle Bingo.

Duncan also analyzed the accounting records kept by Lamkin, Baxter, Bennett, and Cosgrove, along with the deposits made to the seven checking accounts maintained at Liberty National. Duncan concluded that although the income reflected in the books essentially reconciled with the bank deposits, there was no accounting for the cash seized from the premises of Castle Bingo. The government offered Duncan's testimony as evidence that the records kept by Lamkin, Baxter, Bennett, and Cosgrove were inaccurate and thus in violation of Kentucky law.

In April of 1995, the government filed an 82–count Superceding Indictment against Ables, Lamkin, Baxter, Bennett, and Cosgrove. The breakdown of the 82 counts is as follows: Count 1 charged each defendant with conspiring to conduct an illegal gambling business and to commit money laundering in violation of 18 U.S.C. § 371. Count 2 charged each defendant, aided and abetted by each other, with conducting an illegal gambling business in violation of 18 U.S.C. §§ 2 and 1955. Counts 3 through 32 charged Ables with money laundering (using the Castle Leasing account) in violation of 18 U.S.C. § 1956(a)(1)(A)(i). Counts 33 through 43 charged Ables with money laundering (using the Curtis Ables d/b/a CCA account) in violation of § 1956(a)(1)(A)(i). Counts 44, 46, 47, and 48 charged Ables with engaging in monetary transactions in criminally derived property in violation of 18 U.S.C. § 1957. Count 45 charged Ables and Lamkin, aided and abetted by each other, with engaging in monetary transactions in criminally derived property in violation of §§ 2 and 1957. Count 49 charged Lamkin with money laundering in violation of § 1956(a)(1)(A)(i). Counts 50 through 56 charged Ables, Lamkin, and Cosgrove with money laundering in violation of § 1956(a)(1)(A)(i). Counts 57 through 64 charged Bennet with money laundering in violation of § 1956(a)(1)(A)(i). Counts 65 through 81 charged Lamkin with money laundering in violation of § 1956(a)(1)(A)(i). Finally, Count 82 enumerates the items of the defendants' property subject to forfeiture under 18 U.S.C. §§ 982(a)(1), 1956(a)(1)(A)(i), and 1957(a).

The matter proceeded to trial by jury in July of 1996. On August 29, 1996, the jury returned a verdict acquitting Bennet, Baxter, and Cosgrove on all counts with which they were charged. Ables, on the other hand, was found guilty on Counts 1 through 12, 15 through 17, 19, 22, 24 through 27, and 29 through 48. Moreover, the jury found Lamkin guilty on Counts 1, 2, 45, and 49 through 56.

The district court subsequently sentenced Lamkin and Ables to imprisonment for a total term of 37 months and 87 months, respectively, and entered separate judgments

of conviction against them on December 16, 1996. Lamkin now appeals solely on the basis that § 1955 exceeds Congress's power to legislate under the Commerce Clause of the Constitution. Ables, who also challenges the constitutionality of § 1955, puts forth the following additional grounds to vacate his convictions: (1) 18 U.S.C. § 1955(e) exempts the bingo games conducted at Castle Bingo from serving as the basis of a § 1955 violation because those games were conducted on behalf of tax-exempt organizations; (2) the government failed to establish a sufficient nexus between his acts of money laundering and interstate commerce necessary to establish a violation under §§ 1956(a)(1)(A)(i) and 1957; (3) the district court improperly instructed the jury on the definition of interstate commerce as it relates to money laundering; (4) the district court improperly failed to instruct the jury that he could not be convicted under § 1955 if he had a good-faith belief that he was not acting in violation of Kentucky law; (5) his conspiracy conviction under Count 1 of the Superceding Indictment was not supported by sufficient evidence; and (6) the evidence seized by the IRS in connection with its investigation of Castle Bingo should have been suppressed because the search warrants violated the particularity requirement of the Fourth Amendment to the Constitution. Moreover, Ables appeals from his 87-month prison sentence on the basis that the district court incorrectly enhanced his Base Offense Level under USSG § 3B1.1(a).

## II. ANALYSIS

### A. The Constitutionality of 18 U.S.C. § 1955

18 U.S.C. § 1955 provides in relevant part as follows:

**§ 1955. Prohibition of illegal gambling businesses**

(a) Whoever conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business shall be fined ... or imprisoned ... or both.

(b) As used in this section—

(1) "illegal gambling business" means a gambling business which—

(i) is a violation of the law of a State or political subdivision in which it is conducted;

(ii) involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and

(iii) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day.

Both Ables and Lamkin claim that § 1955 is unconstitutional. In so doing, they rely primarily upon *United States v. Lopez*, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995). In *Lopez*, the United States Supreme Court invalidated the Gun–Free School Zones Act of 1990, 18 U.S.C. § 922(q) (criminalizing the possession of a firearm in a school zone), as beyond the authority of Congress to legislate under the Commerce Clause. In its analysis, the Court recognized three distinct categories of legitimate regulation under the Commerce Clause: (1) "the use of the channels of interstate commerce," (2) "the instrumentalities of interstate commerce, or persons or things in interstate commerce," and (3) "activities having a substantial relation to interstate commerce, *i.e.*, those activities that substantially affect interstate commerce." *Lopez*, 514 U.S. at 558–59, 115 S.Ct. 1624 (internal citations omitted). After summarily concluding that § 922(q) fell within neither of the first two categories, the Court explored the government's essential contention "that § 922(q) is valid because possession of a firearm in a local school zone does indeed substantially affect interstate commerce." *Id.* at 563, 115 S.Ct. 1624.

In rejecting that contention, the Court in *Lopez* concluded that § 922(q) had "nothing to do with 'commerce' or any sort of economic enterprise," and therefore could not be sustained under the Court's cases "upholding regulations of activities that arise out of or are connected with a commercial transaction, which viewed in the aggregate, substantially affects interstate commerce." *Id.* at 561, 115 S.Ct. 1624. Moreover, the Court noted that § 922(q) contained "no express jurisdictional element which might limit its reach to a discrete set of firearm possessions that addi-

tionally have an explicit connection with or effect on interstate commerce." *Id.* at 562, 115 S.Ct. 1624. The Court also commented that neither § 922(q) nor its legislative history sets forth congressional findings enabling the Court "to evaluate the legislative judgment that the activity in question substantially affected interstate commerce[.]" *Id.* at 563, 115 S.Ct. 1624.

During the pendency of the present case, a divided panel of this court rejected a *Lopez*-based challenge to the constitutionality of § 1955 in *United States v. Wall,* 92 F.3d 1444 (6th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 690, 136 L.Ed.2d 613 (1997). The *Wall* majority distinguished § 1955 from § 922(q) on the basis that "[b]y its terms, § 1955 is commercial in nature and is not favorably compared to possession of a gun in a school zone, which clearly does not involve commercial activity." *Id.* at 1449. Moreover, the majority noted that although " § 1955 'contains no jurisdictional element which would ensure, through case-by-case inquiry,' that the gambling operation in question affects interstate commerce[,]" *Id.* at 1450 (quoting *Lopez,* 514 U.S. at 561, 115 S.Ct. 1624), § 1955 contains "reams of legislative historical information" within which "Congress specifically found that illegal gambling involves widespread use of, and has an effect upon, interstate commerce and the facilities of interstate commerce." *Wall,* 92 F.3d at 1450 (citations and internal quotation marks omitted). The majority stated in conclusion as follows:

> *Lopez* casts a shadow on regulation that is tenuously related to interstate commerce. *Lopez,* however, does not mandate that § 1955 be invalidated.... Section 1955, in language, purpose, and legislative history, better resembles commercial regulation than does § 922(q).... As a result, we affirm that 18 U.S.C. § 1955 is a proper exercise of congressional power under the United States Constitution.

92 F.3d at 1451–52 (footnote omitted). In dissent, Judge Boggs concluded that the activity regulated by § 1955, while commercial in nature, "does not have a substantial effect on interstate commerce and that the statute

is therefore unconstitutional." *Wall,* 92 F.3d at 1456 (Boggs, J., dissenting).

On appeal, Ables and Lamkin both assert that § 1955 exceeds Congress's power to legislate under the Commerce Clause in spite of this court's conclusion to the contrary in *Wall.* In support of her position, Lamkin contends in her brief that § 1955 "is unconstitutional in that it fails to contain a necessary element that the acts affected interstate commerce, and further, that the U.S. did not prove the acts affected interstate commerce." Ables puts forth the same argument and also asserts that the findings of Congress made in relation to § 1955 are insufficient to sustain the constitutionality of the statute in light of *Lopez.*

Ables recognizes that this court upheld the constitutionality of § 1955 in *Wall.* Indeed, the *Wall* majority considered and rejected the arguments currently put forth on appeal. Ables asks that we reexamine *Wall* because (1) *Wall* was the product of a divided panel in which Judge Boggs concluded that § 1955 is unconstitutional; (2) the *Wall* majority construed *Lopez* in an overly narrow and restrictive fashion; and (3) the *Wall* majority gave overly broad deference to Congress's findings on § 1955 in contravention of *Lopez.* In addition, Ables contends that even if a valid exercise of Congress's power to legislate under the Commerce Clause, § 1955 regulates an area traditionally reserved to the states and thus violates the Tenth Amendment to the Constitution. Lastly, Ables asserts that even if facially constitutional, § 1955 is nonetheless unconstitutional as applied to Ables.

■ A fundamental principle of this court is that "[a] panel ... cannot overrule the decision of another panel. The prior decision remains controlling authority unless an inconsistent decision of the United States Supreme Court requires modification of the decision or this Court sitting en banc overrules the prior decision." *Salmi v. Secretary of Health and Human Servs.,* 774 F.2d 685, 689 (6th Cir.1985). Accordingly, the conclusion of the *Wall* majority that § 1955 is a proper exercise of congressional power under the Commerce Clause precludes us from holding to the contrary.

Moreover, we are satisfied that Ables's additional attacks upon the constitutionality of § 1955 are without merit. The proposition that a valid exercise of congressional authority under the Commerce Clause may nevertheless violate the Constitution because it regulates an area traditionally reserved to the states has been rejected by the United States Supreme Court. *See Gregory v. Ashcroft,* 501 U.S. 452, 460, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991) ("As long as it is acting within the powers granted it under the Constitution, Congress may impose its will on the States. Congress may legislate in areas traditionally regulated by the States."). Furthermore, Ables cites no authority in support of the proposition that a criminal statute constituting a valid exercise of congressional authority under the Commerce Clause may nevertheless be unconstitutional as applied to a particular defendant when the statute's jurisdictional requirements have been met. Accordingly, Ables's arguments relating to the purported unconstitutionality of § 1955 must fail.

## B. The § 1955(e) Exemption

■ 18 U.S.C. § 1955(e) provides as follows:

(e) This section shall not apply to any bingo game, lottery, or similar game of chance *conducted by an organization exempt from tax under paragraph (3) of subsection (c) of section 501 of the Internal Revenue Code of 1954,* as amended, if no part of the gross receipts derived from such activity inures to the benefit of any private shareholder, member, or employee of such organization except as compensation for actual expenses incurred by him in the conduct of such activity.

(Emphasis added.)

Ables asserts that the bingo games conducted at Castle Bingo fell within the ambit of 18 U.S.C. § 1955(e) because those games were conducted "on behalf of" organizations exempt from tax under I.R.C. § 501(c)(3) and therefore cannot serve as the basis of a § 1955 violation. He argues in support of his position that although its precise language does not apply to games conducted "on behalf of" tax-exempt organizations, § 1955(e)

is ambiguous as to whether it applies to such games and thus the rule of lenity triggers its application. *See Rewis v. United States,* 401 U.S. 808, 812, 91 S.Ct. 1056, 28 L.Ed.2d 493 (1971) ("[A]mbiguity concerning the ambit of criminal statutes should be resolved in favor of lenity.")

■ When interpreting a statute, a court looks "first and foremost" to the text of the statute. *United States v. Alvarez–Sanchez,* 511 U.S. 350, 356, 114 S.Ct. 1599, 128 L.Ed.2d 319 (1994). Section 1955(e) expressly limits its application to any bingo game (or similar game of chance) that is *"conducted by an organization* exempt from tax" under I.R.C. § 501(c)(3) (emphasis added). In so doing, § 1955(e) does not provide or even imply that such organizations may authorize outside parties to conduct gaming on their behalf. The latter clause of § 1955(e) provides that § 1955(e) applies only "if no part of the gross receipts derived from such activity inures to the benefit of any private shareholder, member, or employee of [a tax-exempt] organization except as compensation for actual expenses incurred by him *in the conduct* of such activity[,]" (emphasis added). This clause contemplates that the individuals actually conducting the gaming in question will be representatives of the organization, *i.e.,* shareholders, members, or employees. Section 1955(e), therefore, unambiguously excludes individuals outside of a tax-exempt organization from conducting bingo games on behalf of that organization.

Absent any ambiguity, the rule of lenity has no application to § 1955(e). Accordingly, we are satisfied that the bingo games that were conducted by Castle Bingo fell outside the ambit of the § 1955(e) exemption.

## C. The Required Effect upon Interstate Commerce under §§ 1956 and 1957

■ 18 U.S.C. § 1956 provides in relevant part as follows:

**§ 1956. Laundering of monetary instruments**

(a)(1) Whoever, knowing that the property involved in a *financial transaction* represents the proceeds of some form of unlawful activity, conducts or attempts to

conduct such a *financial transaction* which in fact involves the proceeds of specified unlawful activity—

> (A)(i) with the intent to promote the carrying on of specified unlawful activity; .... shall be sentenced to a fine ... or imprisonment ... or both.

(Emphasis added.) The term "financial transaction" within the meaning of § 1956(a)(1) is defined as follows:

> (A) a transaction which in any way or degree affects interstate or foreign commerce (i) involving the movement of funds by wire or other means or (ii) involving one or more monetary instruments, or (iii) involving the transfer of title to any real property, vehicle, vessel, or aircraft, or (B) a transaction involving the use of a financial institution which is engaged in, or the activities of which affect, interstate or foreign commerce *in any way or degree* [.]

18 U.S.C. § 1956(c)(4) (emphasis added). Courts have construed the "in any way or degree" language of § 1956(c)(4) in such a manner that the government need only prove that the transaction in question had a *de minimis* effect upon interstate commerce. *See, e.g., United States v. Peay,* 972 F.2d 71, 74 (4th Cir.1992).

18 U.S.C. § 1957 provides in relevant part as follows:

> **§ 1957. Engaging in monetary transactions in property derived from specified unlawful activity**
>
> (a) Whoever ... knowingly engages or attempts to engage in *a monetary transaction* in criminally derived property that is of a value greater than $10,000 and is derived from specified unlawful activity, shall be punished as provided in subsection (b).

(Emphasis added.) The term "monetary transaction" within the meaning of § 1957(a) includes any transaction that would constitute a "financial transaction" under § 1956(c)(4)(B). 18 U.S.C. § 1957(f)(1).

Ables challenges his convictions under §§ 1956(a)(1)(A)(i) and 1957 on the basis that the government failed to establish the necessary nexus between interstate commerce and his prohibited transactions. He contends that the only evidence offered by the government concerning an effect upon interstate commerce was Trial Stipulation # 2, which provided that during the time period covered by the Superceding Indictment, "Liberty National Bank and Trust Company, a/k/a Bank One of Kentucky, was a financial institution which was engaged in activities which affected in some way or degree interstate commerce." *See* § 1956(c)(4)(B). Ables argues that this nexus to interstate commerce is insufficient in light of *Lopez,* which he construes as requiring the government to prove that each individual prohibited transaction "substantially" affected interstate commerce. *See Lopez,* 514 U.S. at 558–59, 115 S.Ct. 1624 ("Congress' commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce, *i.e.,* those activities that substantially affect interstate commerce.") (internal citation omitted). We reject Ables's contention for the reasons articulated by the Second Circuit in *United States v. Leslie,* 103 F.3d 1093 (2d Cir.1997).

In *Leslie,* the defendants were convicted of various money-laundering charges under 18 U.S.C. § 1956. While acknowledging that § 1956 requires the government to prove that each prohibited transaction had only a *de minimis* effect upon interstate commerce, the defendants challenged their convictions on the basis that *Lopez* requires the government to prove that each individual transaction had a "substantial" effect upon interstate commerce. Accordingly, the defendants maintained that the government failed to meet its burden of establishing a § 1956 violation.

In rejecting the defendants' contention, the Second Circuit surveyed the post-*Lopez* jurisprudence interpreting the Hobbs Act, 18 U.S.C. § 1951 (from which § 1956 derived its language), and noted that courts had held that *Lopez* did not affect the *de minimis* evidentiary standard. *Leslie,* 103 F.3d at 1100. "These courts reasoned that the Hobbs Act regulates activities which, in the aggregate, have a substantial effect on interstate commerce; hence, the *de minimis* character of individual instances arising under [the] statute is of no consequence." *Id.*

(citations and internal quotation marks omitted). Applying that analysis to § 1956, the *Leslie* court stated as follows:

Money laundering is the archetypal activity which, while in isolation may not affect interstate commerce, undoubtedly will have ramifications in interstate commerce when taken in the aggregate. The single money launderer resembles Mr. Filburn, the farmer, whose individual demand for wheat, while inconsequential, was 'not enough to remove him from the scope of federal regulation where ... his contribution, taken together with that of many others similarly situated, is far from trivial.'

*Id.* (quoting *Wickard v. Filburn,* 317 U.S. 111, 127–28, 63 S.Ct. 82, 87 L.Ed. 122 (1942)). The *Leslie* court concluded that because *Lopez* did not elevate the government's burden under § 1956, the "government need only prove that the individual subject transaction has, at least, a *de minimis* effect on interstate commerce." 103 F.3d at 1100. We join the Fifth Circuit in adopting *Leslie*'s conclusion. *See United States v. Westbrook,* 119 F.3d 1176, 1191–92 (5th Cir.1997) (citing *Leslie* for the proposition that the *de minimis* standard applicable to § 1956 continues in effect after *Lopez* ).

Applying the reasoning of *Leslie* to the present matter, the government only needed to prove that each of Ables's prohibited transactions had a *de minimis* effect upon interstate commerce. In light of the evidence establishing Able's extensive use of Liberty National Bank in the operation of the Castle Bingo activities and the stipulation that Liberty National "was a financial institution which was engaged in activities which affected in some way or degree interstate commerce[,]" *see* § 1956(c)(4)(B), we are satisfied that the government met its burden. Accordingly, we reject Ables's contention that the government failed to establish a sufficient nexus between Ables's transactions and interstate commerce necessary to sustain violations of §§ 1956 and 1957.

### D. The Jury Instructions on Money Laundering

With respect to the charges brought under §§ 1956(a)(1)(A)(i) and 1957, the dis-trict court instructed the jury in relevant part as follows:

It is not necessary for the United States to show that a Defendant actually intended or anticipated an affect [sic] in interstate or foreign commerce, or that the commerce was actually affected. All that is necessary is that the natural and probable consequences of the Defendant's actions would be to affect interstate or foreign commerce.

Ables challenges the foregoing instruction on the basis that it permitted the jury to convict him of violating §§ 1956(a)(1)(A)(i) and 1957 without requiring the government to establish that interstate commerce was actually affected by his prohibited transactions. Ables relies primarily upon *United States v. Aramony,* 88 F.3d 1369 (4th Cir. 1996), in which the Fourth Circuit held that a virtually identical instruction rendered with respect to a § 1957 charge was erroneous because the instruction "constituted a failure to instruct the jury on an essential element necessary for a conviction under § 1957[,]" namely, a *de minimis* effect upon interstate commerce. *Aramony,* 88 F.3d at 1387. The *Aramony* court further held that "the error is not subject to harmless error analysis" and vacated the § 1957 convictions accordingly.

Given the striking similarity of the § 1957 instruction in *Aramony* with that in the present matter, an application of the reasoning espoused in *Aramony* would serve to invalidate Ables's convictions under §§ 1956(a)(1)(A)(i) and 1957, as both statutes require the government to prove a *de minimis* effect upon interstate commerce. Unlike in *Aramony,* however, the parties to the present matter stipulated that Liberty National, the financial institution in question, "was engaged in activities which affected in some way or degree interstate commerce." Because the government may satisfy its interstate-commerce burden under either § 1956(a)(1)(A)(i) or § 1957 simply by establishing that a prohibited transaction "involv[ed] the use of a financial institution which is engaged in, or the activities of which affect, interstate or foreign commerce in any way or degree[,]" 18 U.S.C. § 1956(c)(4)(B),

the government was not required to put forth additional evidence that Ables's transactions "actually affected" interstate commerce in order to secure his convictions under §§ 1956(a)(1)(A)(i) or 1957. Accordingly, we are satisfied that the jury was permitted to find that Ables violated these sections based upon the nexus to interstate commerce established in the stipulation. The challenged jury instruction was in effect superfluous in light of that stipulation.

#### E. Ables's Request for a Good–Faith Instruction

In order to prove that a defendant conducted an illegal gambling business within the meaning of § 1955, the government must establish that the gambling business in question violated the law of the state in which that business was conducted. *See* 18 U.S.C. § 1955(b)(1)(i). At trial, the district court denied Ables's request that the jury be instructed that Ables could not be convicted of violating § 1955 if he had a good-faith belief that he was not acting in violation of Kentucky law. Ables asserts on appeal that the district court erred in not instructing the jury as requested because in order to secure a conviction under § 1955, the government must prove that Ables "knowingly" violated the law of Kentucky. This court, however, has rejected such an argument. *See United States v. Sims*, Nos. 95–5009, 95–5010, 1995 WL 620965, at *7 (6th Cir.1995) (unpublished disposition).

In *Sims*, the defendants contended that the district court erred in failing to include a definition of the term "knowingly" in the jury instructions on the substantive crime of conducting an illegal gambling business in violation of § 1955. This court found the defendants' contention unpersuasive, holding that the "crime spelled out in 18 U.S.C. § 1955 is a general intent crime, where 'a defendant need not be shown to have acted willfully in the sense of intentionally violating a known state legal duty.'" *Id.* (quoting *United States v. Conley*, 859 F.Supp. 909, 930 (W.D.Pa.1994)). Accordingly, the *Sims* court held that the district court did not err in failing to instruct the jury on meaning of "knowingly."

While an unpublished opinion has no precedential force, we are persuaded by the reasoning in *Sims*. We are thus satisfied that Ables was not entitled to the requested good-faith instruction on the § 1955 charge. Because the crime of conducting an illegal gambling business as defined under § 1955 is one of general intent, Ables cannot evade conviction under that section by establishing that he unwittingly or unknowingly conducted the bingo games at Castle Bingo in violation of the law of Kentucky. We note that our conclusion is consistent with that of our sister circuits that have addressed the issue. *See United States v. O'Brien*, 131 F.3d 1428, 1430 (10th Cir.1997) (holding that to be convicted under § 1955, a defendant need not know that the gambling business, among other things, violated state law); *United States v. Hawes*, 529 F.2d 472, 481 (5th Cir.1976) (holding that intent to violate state law is not an essential element of a § 1955 violation).

#### F. Sufficiency of the Evidence on the Conspiracy Conviction

18 U.S.C. § 371 provides in relevant part as follows:

> **§ 371. Conspiracy to commit offense or to defraud United States**
>
> If two or more persons conspire ... to commit any offense against the United States ... in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined ... or imprisoned ... or both.

This court has recognized that "the government need not prove a formal agreement to establish the existence of a conspiracy to violate federal law and that a tacit or mutual understanding among the parties will suffice." *United States v. Ellzey*, 874 F.2d 324, 328 (6th Cir.1989). Moreover, "[a] conspiracy may be inferred from circumstantial evidence that can reasonably be interpreted as participation in the common plan." *United States v. Bavers*, 787 F.2d 1022, 1026 (6th Cir.1985).

Count 1 of the Superceding Indictment charged Ables and the other defendants with conspiring to conduct an illegal gambling

business and to commit money laundering. Ables argues on appeal that the evidence presented at trial was insufficient to support his conspiracy conviction. Specifically, he contends that the government failed to produce any evidence that he had a spoken or an unspoken mutual understanding with another person to commit a violation of federal law.

The standard applicable to Ables's claim of insufficient evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (emphasis in original). Circumstantial evidence alone is sufficient to sustain a conviction and such evidence need not "remove every reasonable hypothesis except that of guilt." *United States v. Stone,* 748 F.2d 361, 363 (6th Cir.1984).

The evidence at trial demonstrated that Lamkin, Baxter, and Bennet, whom Ables met through an advertisement that he placed in a bingo periodical, assisted Ables in his effort to renovate the Louisville, Kentucky facility where Castle Bingo would operate from January of 1990 until February of 1992. Ables controlled significant aspects of the bingo activity at Castle Bingo, while Lamkin, Baxter, Bennet, and Cosgrove comprised its office staff. In that capacity, they prepared accounting ledgers for each bingo session conducted at Castle Bingo. Many of these ledgers indicated that Castle Bingo was losing money.

The evidence also showed that Castle Bingo conducted bingo sessions using the government-issued "tax-exempt" identification numbers of various organizations exempt from tax under I.R.C. § 501(c)(3). The organizations, however, did not receive the net proceeds from any particular bingo session. Rather, Castle Bingo issued donations to the organizations at irregular intervals for amounts in round figures. Representatives from each organization testified at trial that they were not involved in the conducting, promoting, or administering of bingo activity at Castle Bingo. Furthermore, the representatives testified that they had no access to Castle Bingo's books and records and lacked any knowledge of the manner in which Castle Bingo operated or the amount of money that the bingo activity generated.

In February of 1992, the IRS searched Castle Bingo and discovered approximately $454,000 in cash and many financial records. A search of Ables's home revealed approximately $128,000 in cash, along with receipts and other financial records. Furthermore, the IRS seized approximately $229,000 from the various accounts maintained at Liberty National. According to the books and records kept by Lamkin, Baxter, Bennet, and Cosgrove, Castle Bingo had gross receipts of approximately $3.6 million during its operation. Of that amount, the tax-exempt organizations received just over $256,000. Duncan's testimony at trial indicated that during Castle Bingo's operation, Ables's net worth increased by over $800,000, and that approximately $600,000 of that figure was comprised of tangible assets paid for in cash. Duncan testified further that he traced the deposits and checks on each of Ables's three checking accounts and determined that about $500,000 of Ables's increase in net worth could not be accounted for from his leasing, concession, and check-cashing income. Duncan also compared the accounting records at Castle Bingo with the deposits made to the accounts at Liberty National. Duncan concluded that although the income reflected in the books essentially reconciled with the bank deposits, there was no accounting for the cash seized from the premises of Castle Bingo.

We are satisfied that any rational trier of fact, after viewing the foregoing evidence in the light most favorable to the government, could have found that Ables entered into a conspiracy to conduct an illegal gambling business and to commit money laundering. At the very least, a rational trier of fact could have found that Ables agreed with the others to exclude the bulk of the bingo proceeds from the accounting ledgers. Such an agreement amounted to an agreement to maintain inaccurate records in violation of Kentucky law, an act which constituted a violation of § 1955. Moreover, a rational trier of fact could have found that Ables agreed with the others to maintain the ac-

counts at Liberty National and regularly deposit bingo proceeds in those accounts. Because those bingo proceeds constituted proceeds from unlawful activity, such an agreement would constitute an agreement to violate §§ 1956(a)(1)(A)(i) and 1957. Accordingly, we sustain Ables's conspiracy conviction under Count 1 of the Superceding Indictment.

### G. The Particularity of the Search Warrants

The search warrants executed by the IRS in connection with their investigation of Castle Bingo enumerated various categories of items to be seized, including:

2. Books, records, receipts, bank statements and records, money drafts, letters of credit, money orders and cashier's checks, money wrappers, pass books, bank checks, automatic teller machine receipts, Western Union receipts, safety deposit box keys, and *other items evidencing the obtaining, secreting, transfer, and/or concealment of assets and the obtaining, secreting, transfer and/or expenditure of money.*

. . . . .

5. Weapons and ammunition.

(Emphasis added.)

Ables moved to suppress the evidence seized by the IRS on the basis that the search warrants' description of personal property to be seized was so broad and unlimited that the warrants violated the particularity requirement of the Fourth Amendment to the Constitution, which mandates that a warrant particularly describe the place to be searched and the things to be seized. Ables also argued that the IRS lacked probable cause to search for and seize "weapons and ammunition."

A magistrate judge conducted a suppression hearing, and subsequently issued findings of fact and conclusions of law. He recommended that Ables's contentions be rejected and that his motion to suppress be overruled accordingly. The magistrate judge determined that each category of personal property listed in the search warrants was sufficiently particular for purposes of the Fourth Amendment. In addition, the magis-

trate judge noted that the government conceded that any weapons or ammunition seized by the IRS would have been subject to suppression for lack of probable cause. Because no such materials were seized, however, the magistrate judge concluded that Ables's motion was moot with respect to that issue. After conducting a *de novo* review, the district court adopted the magistrate judge's findings of fact and conclusions of law, thereby overruling Ables's motion to suppress. Ables now appeals the district court's ruling.

Ables argues on appeal that by authorizing the seizure of any item "evidencing . . . the obtaining, secreting, transfer and/or expenditure of money," a description into which all items purportedly fit, the warrants authorized the IRS to perform a general exploratory rummaging of the persons and places searched, and afforded the IRS unbridled discretion in deciding which items warranted seizure. Ables contends further that there was no probable cause to believe that weapons or ammunition could be found at the premises searched.

■ General search warrants which fail to particularly describe the things to be searched for and seized "create a danger of unlimited discretion in the executing officer's determination of what is subject to seizure and a danger that items will be seized when the warrant refers to other items." *United States v. Savoca,* 761 F.2d 292, 298–99 (6th Cir.1985). "However, the degree of specificity required is flexible and will vary depending on the crime involved and the types of items sought. Thus a description is valid if it is as specific as the circumstances and the nature of the activity under investigation permit.'" *United States v. Henson,* 848 F.2d 1374, 1383 (6th Cir.1988) (quoting *United States v. Blum,* 753 F.2d 999, 1001 (11th Cir.1985)).

In upholding the constitutionality of search warrants containing broadly worded categories of items to be seized, the Second Circuit has noted that "the language of a warrant is to be construed in light of an illustrative list of seizable items." *United States v. Riley,* 906 F.2d 841, 844 (2d Cir.1990). The *Riley*

court held that "[o]nce a category of seizable papers has been adequately described, with the description delineated in part by an illustrative list of seizable items, the Fourth Amendment is not violated because the officers executing the warrant must exercise some minimal judgment as to whether a particular document falls within the described category." *Id.* at 845. We agree with the analysis espoused in *Riley*.

In the present matter, the challenged warrants (specifically, paragraph 2) supplied sufficient examples of the items that the IRS was authorized to seize—bank statements, money drafts, letters of credit, money orders, cashier's checks, pass books, bank checks, automatic teller machine receipts, Western Union receipts, etc. When construed in light of the foregoing illustrative list of items, there can be no question that the phrase "other items evidencing the obtaining, secreting, transfer, and/or concealment of assets and the obtaining, secreting, transfer and/or expenditure of money" did not authorize the IRS to conduct a general exploratory rummaging, as claimed by Ables. Rather, paragraph 2 simply authorized the search for and seizure of *records* tracking the movement of money and/or assets. Accordingly, we are satisfied that the warrant did not violate the particularity requirement of the Fourth Amendment.

 Furthermore, we are satisfied that the inclusion of "[w]eapons and ammunition" in the search warrants as a category of items to be searched for and seized did not serve as a basis to suppress the entirety of the evidence seized by the IRS, notwithstanding the government's concession that those particular items would have been subject to suppression if indeed seized. *See United States v. Blakeney*, 942 F.2d 1001, 1027 (6th Cir. 1991) (holding that the district court properly rejected the defendant's claim that overbreadth of the search warrant was a basis to suppress evidence, when items seized pursuant to overbroad portion of the warrant were not introduced into evidence and, therefore, defendant was not prejudiced).

## H. The USSG § 3B1.1(a) Enhancement

USSG § 3B1.1 provides in relevant part as follows:

### § 3B1.1. *Aggravating Role*

Based on the defendant's role in the offense, increase the offense level as follows:

(a) If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels.

In distinguishing between a leadership and organizational role from one of mere management or supervision, a district court considers the following factors:

[T]he exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

§ 3B1.1, Application Note 4.·

The Presentence Investigation Report (the "PIR") prepared by the United States Probation Office in connection with Ables's convictions calculated a Total Offense Level of 29 and a Criminal History Category of I, resulting in an imprisonment range of 87 to 108 months on each count of conviction. The Total Offense Level of 29 was derived in part from application of the § 3B1.1(a) four-level enhancement.

Ables objected to this enhancement. At the sentencing hearing, he testified that he had no leadership role with respect to the operation of Castle Bingo. He did, however, admit that he established hall rules, made announcements to bingo patrons, made changes to the programs for particular sessions, fired several floor workers, and negotiated the purchase price for various prizes. Ables's testimony to the effect that he had no leadership role over the operation of Castle Bingo was bolstered by that of Baxter and Bennett, each of whom denied that Ables was their leader.

The district court ultimately adopted the sentencing calculations as set forth in the PIR, including the § 3B1.1(a) enhancement, and imposed a sentence of imprisonment for a total term of 87 months. The district court reasoned as follows:

In this case, having heard the testimony at trial and then having heard the testimony here, I think there was a leader and there was an organizer in these activities and I find that Mr. Ables was an organizer or leader of criminal activities involving five or more persons or was otherwise extensive.

If you took it at face value and I guess the witnesses here were trying to say they were the leaders and the organizers, but I don't believe that could be the truth from what I heard here or what I heard at trial. I base this upon the fact that I believe Mr. Ables had the ultimate decision-making authority on the basis of proof I heard at trial, by nature of the participation in all aspects of this case, by his recruitment of the people who just testified here, he recruited them to be involved in this activity, and by the large share of the proof to the crime before which they've been convicted which Mr. Ables had as compared to the relatively minute shares of anyone else's participating in it, and by the degree of participation in planning and organizing the offense and the degree of his control by the testimony of everyone who testified here. They wouldn't say he was the leader, but they said they did what he said, and I think that's ultimately, most ultimately it. So I find that the four point aggravating [sic] role enhancement applies.

Ables now appeals from his 87–month prison sentence on the basis that the district court erroneously applied the § 3B1.1(a) enhancement. Ables contends that while there is ample evidence that he managed the bingo hall at Castle Bingo, there is no evidence that Lamkin, Baxter, Bennet, or Cosgrove were under his direction or control. He maintains that the evidence demonstrates only that he frequently suggested improvements to the business, but provided no leadership to others working at the bingo hall.

When a defendant contests the applicability of an enhancement provision, the government must establish the enhancement factors by a preponderance of the evidence. *See United States v. Feinman*, 930 F.2d 495, 500 (6th Cir.1991). A district court's determination that § 3B1.1 is indeed applicable "is a factual finding subject to the 'clearly erroneous' standard of review." *Id.*A factual finding is clearly erroneous when, though there is evidence to support that finding, "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948). On the other hand, if a district court's account of the evidence is plausible in light of the record viewed in its entirety, the reviewing court "may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Anderson v. Bessemer City*, 470 U.S. 564, 573–74, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). The district court's choice between two permissible views of the evidence cannot, therefore, be clearly erroneous. *Id.* at 574, 105 S.Ct. 1504. Accordingly, when a factual finding is based upon a decision "to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error." *Id.* at 575, 105 S.Ct. 1504.

In applying the § 3B1.1(a) enhancement, the district court determined from the evidence presented that Ables had ultimate decision-making authority with regard to the bingo operation at Castle Bingo. The district court also determined that Ables recruited the others to be a part of that operation, and that he exercised a high degree of participation, organization, and planning. In light of the testimony confirming Ables's recruitment efforts, administration of bingo activity, and leadership role, we are satisfied that the government met its burden of establishing the enhancement factors by a preponderance of the evidence. Under these circumstances, we are without "a definite and firm conviction" that the district court com-

mitted a mistake by applying the § 3B1.1(a) enhancement. *United States Gypsum,* 333 U.S. at 395, 68 S.Ct. 525. Accordingly, we sustain the district court's imposition of an 87–month sentence of imprisonment for Ables.

### III. CONCLUSION

For the foregoing reasons, we **AFFIRM** the convictions of both Ables and Lamkin, and further **AFFIRM** Ables's prison sentence.