**NOT RECOMMENDED FOR PUBLICATION**
File Name: 05a0987n.06
Filed: December 15, 2005

No. 05-5267

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT


**UNITED STATES OF AMERICA,**

　　　*Plaintiff-Appellee,*

**v.**

**ALVIN LEE HARRIS,**

　　　*Defendant-Appellant.*

On Appeal from the United States
District Court for the Western District
of Tennessee, Eastern Division

**BEFORE: GUY and GIBBONS, Circuit Judges; and EDMUNDS, District Judge.**[*]

　　　**PER CURIAM.**　　　Alvin Lee Harris appeals his conviction for being a felon in possession of a firearm, 18 U.S.C. § 922(g), arguing that the district court erred when it denied his motion to suppress a handgun seized during a warrantless search of the home where he was residing. Because the district court properly concluded that there was one continuous search that did not exceed the scope of the exigencies that justified the warrantless entry and seizure of the firearm, we affirm the district court's decision.

## I.

　　　On August 24, 2003, at about 1:00 or 2:00 a.m., Jason McAlister and Terry Stewart, Madison County Sheriff's Department deputies, were riding together when they were dispatched to a location

---

[*]The Honorable Nancy G. Edmunds, United States District Judge for the Eastern District of Michigan, sitting by designation.

on Bowman Loop Road. The dispatch informed them that a fight was in progress, that several gun shots had been fired, and that they were to talk with the reporting neighbor, Mr. Fowler.

The deputies interviewed Mr. Fowler. He told them that he was in his bedroom watching television and heard four to five gunshots. He turned off the television to listen closer; but, when he did not hear anything out of the ordinary, went about his regular business. A few moments later, he heard a single gunshot. So, he went to his window, raised it, and heard his neighbors from a few houses down arguing. He saw them wrestling outside their home and heard the female say, "You're hurting me. Let me go. Why don't you just let me go. Let go of me."

The deputies then drove to the neighbors' residence located at 90 Bowman Loop, got out of their car, and went up to house. McAlister went to the back of the residence and Stewart went to the front. In the meantime, Sergeant Briley with the Tennessee Highway Patrol, who had also responded to the "shots fired" dispatch, joined McAlister as he went around to the rear of the 90 Bowman Loop residence. They discovered the back door to the residence standing wide-open.

Because the back door to the residence was standing wide-open and there was no screen door, Deputy McAlister and Sergeant Briley could see directly into the kitchen. McAlister called out to Deputy Stewart, informing him that the back door was standing open. Once Deputy Stewart joined them, they announced their presence, calling out "Sheriff's Department" several times. There was no response. They could see from outside the doorway that the kitchen was in disarray; a pot of food was spilled on the floor; a picture frame, a cordless phone, and other household items lay broken on the floor; and furniture was overturned.

Deputies McAlister and Stewart and Sergeant Briley then entered and started to search the house because of the report that shots were fired and the home was in obvious disarray. As they

went further into the house, they saw more disarray and evidence of injury: a framed picture and wall with similar fist-sized holes, blood smeared around the hole in the wall, on other parts of the wall, and, further down the hall, a blood smear up high on the wall. They went through the small to average-size house to see if anybody was there. Deputy Stewart also went back outside to search around the house. The officers had not found anyone in the house when they received a radio dispatch from Sergeant Wester with the Madison County Sheriff's Department, who was on his way to the Bowman Loop residence at Deputy McAlister's request.

In that radio dispatch, Sergeant Wester informed Deputy McAlister and Sergeant Briley that he had spotted two individuals walking in the roadway near the Bowman Loop residence, stopped and questioned them, and believed they were the two subjects who lived there. He also informed them that the male and female subjects were walking back to the residence and that Sergeant Wester was following them in his police car. They arrived at the residence within approximately five to ten minutes after Sergeant Wester's radio dispatch. Deputy Stewart saw all three approach as he was outside searching the perimeter of the residence. The male was Alvin Lee Harris and the female was Shantell Jones, the woman with whom Harris lived at the Bowman Loop residence.

Once they arrived at the residence, Alvin Lee Harris and Ms. Jones were separated and questioned about the reported argument, from where the gun shots had come, who had fired them, and whether there was anybody else in the residence. Neither one offered any information. During the questioning, Alvin Lee Harris became more and more agitated and was handcuffed and placed in the back of a patrol car as a security measure, being advised at that time that he was not under arrest. Ms. Jones was not handcuffed or placed in a patrol car at any time. After Alvin Harris was

handcuffed and placed in the back of a patrol car, Ms. Jones did indicate that a domestic assault had occurred.

Shortly after their arrival, while other officers were attempting to get answers from Alvin Lee Harris and Ms. Jones, Sergeant Briley stepped out onto the back porch, quickly determined that they were not cooperating, and then resumed his search of the home because neither Alvin Harris nor Ms. Jones would tell the officers whether anyone else was in the house, there was blood in several places on the wall, and a weapon had not yet been located in response to the "shots fired" police call. Deputy McAlister went back into the house and joined Sergeant Briley in his search. Deputy Stewart and Sergeant Wester later joined them.

During this resumed search, Sergeant Briley was investigating blood found up high on the wall, near the ceiling. He saw an overturned chair next to a six-foot tall entertainment center near the wall with the blood smear. He turned the chair over, stood on it, and observed that this was a bloody hand print and that it was in a spot where a person would balance or brace himself. He then looked to his left and saw, in plain view, a pistol laying on the top of the entertainment center. He immediately informed Sergeant Wester and Deputy McAlister, who were also in the home, that he had found a weapon that had been fired one time. At the time the gun was discovered, neither Alvin Harris nor Ms. Jones appeared to have any physical injuries, and the police had not discovered the source of the blood found in the home.

On April 19, 2004, a grand jury indicted Harris on one count of possessing a firearm while being a convicted felon, in violation of 18 U.S.C. § 922(g).

Harris filed a motion to suppress the firearm and statements made after his arrest, arguing that he had standing to challenge the warrantless entry of Ms. Jones's home and that the entry and

subsequent search and seizure were constitutionally invalid. An evidentiary hearing was held on October 26, 2004, and Harris's motion to suppress was denied.

After concluding that Harris had standing to raise a Fourth Amendment challenge, the district court addressed his argument that the firearm should be suppressed. Harris conceded that the initial warrantless entry and search for a victim, suspect, and weapons was justified by exigent circumstances. A constitutional violation occurred, he argued, because Sergeant Briley had stepped out onto the back porch for a few minutes, while Harris and Ms. Jones were secured by the police, and then re-entered without a search warrant, searched the premises, and found the gun at issue here as a result of that second warrantless entry. The government responded there was one entry into the home, justified by exigent circumstances, and one continuous search for victims, suspects, and weapons, justified by the scope of the exigencies that led to the warrantless entry of the home.

The district court conducted an evidentiary hearing at which the officers involved in the search provided the above testimony. Based on that testimony, the district court found that: (1) the initial entry into the home was justified by exigent circumstances involving a risk of danger to others in light of a report of gun shots, two people fighting in the yard, and an open-door view of the Bowman Lane home in obvious disarray; (2) upon entry and while searching the home, the police discovered blood and evidence that someone was recently injured; and (3) that when Sergeant Briley stepped out onto the porch for a very short time, the officers had not completed their initial search for a shooter, a victim, or a firearm. The district court concluded that when Sergeant Briley went back into the home after momentarily stepping out onto the back porch, this was not a re-entry but a continuation of the original entry and uncompleted search.

The district court also found credible Deputy McAlister's testimony that, in his experience with domestic disputes, there is a need for officers to protect themselves and others against the risk of harm from both the victim and the suspect. The district court likewise found credible the officers' testimony that at the time the gun was recovered, they did not know if the shooter was Harris or Ms. Jones or someone else, and thus concluded that they were justified to look for weapons during their continued search of the Bowman Loop residence. Accordingly, the district court denied Harris's motion to suppress.

Harris was subsequently tried and found guilty on November 2, 2004. He was sentenced on February 2, 2005, and a Judgment was entered on that date. Harris then filed this timely appeal on February 10, 2005.

## II.

This Court examines the district court's factual findings for clear error[1] and its conclusions of law de novo. *United States v. McCraven*, 401 F.3d 693, 696-97 (6th Cir. 2005).

On appeal, Harris offers three reasons why the handgun should have been suppressed: (1) there were two warrantless entries into the home; and although the first was justified by exigent circumstances, the second entry was not; (2) even if the district court correctly found there was only one warrantless entry, at the time the firearm was found, the exigent circumstances justifying that entry no longer existed and thus the seizure of the firearm violated the Fourth Amendment; and (3)

---

[1]"A factual finding is clearly erroneous when, though there is evidence to support that finding, 'the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *United States v. Ables*, 167 F.3d 1021, 1035 (6th Cir. 1999) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)).

even if exigent circumstances still existed, the police discovered the handgun during a search that exceeded their scope.

**A.**

The first question before the Court is whether the district court erred when it found that there was one warrantless entry into the home, justified by exigent circumstances, and one continuous search for victims, suspects, and weapons. We conclude that it did not.

Absent exigent circumstances, the Fourth Amendment prohibits warrantless entries. This Court has identified four general categories of exigent circumstances where warrantless entries are justified: "(1) hot pursuit of a fleeing felon, (2) imminent destruction of evidence, (3) the need to prevent a suspect's escape, and (4) a risk of danger to the police or others." *United States v. Rohrig*, 98 F.3d 1506, 1515 (6th Cir. 1996). "A determination of whether sufficient exigent circumstances exist to justify a warrantless entry and seizure requires that the court consider the totality of the circumstances and the inherent necessities of the situation at the time." *United States v. Plavcak*, 411 F.3d 655, 663 (6th Cir. 2005) (internal quotes and citations omitted).

Harris does not dispute that, based on the information the police had at the time they first arrived at the residence, their entry was justified by exigent circumstances involving the risk of danger to the police or others. The police were responding to a "shots fired" dispatch, a report of a male and female fighting in the yard of the Bowman Loop residence, an open-door view of the kitchen showing that it was in obvious disarray, and no response to their shouts announcing their presence. Thus, the police were justified to enter and search the home for suspects, victims, and guns without first obtaining a search warrant.

Harris does dispute the district court's factual finding that there was only one warrantless entry. This finding is not clearly erroneous. It is supported by Sergeant Briley's testimony that, other than the very short amount of time he stepped out onto the back porch to see if Harris or Ms. Jones were providing the police with necessary information, he remained in the home. It is also supported by testimony that, at the time Sergeant Briley stepped back inside, the police had not completed their search for a shooter, victims, or a firearm despite evidence of a struggle and blood smears and a report of "shots fired."

**B.**

This Court also rejects Harris's second argument. The district court did not err when it concluded that, at the time the firearm was found, the exigent circumstances justifying entry into the Bowman Loop residence continued to exist. The police entered the home in response to a "shots fired" dispatch, a neighbor's report of a male and female fighting in the residence's yard, an open-door view of the kitchen showing that it was in obvious disarray, and no response to the officers' shouts announcing their presence. After entering the home, the police discovered blood on the walls, a pot filled with food thrown on the floor, furniture overturned, and a picture frame and wall with fist-sized holes. Although Harris and Ms. Jones had subsequently arrived at the residence and were being questioned, neither was providing information that would negate the existence of exigent circumstances and the need to continue the search.

Sergeant Briley testified that, at the time of Harris's and Ms. Jones's arrival, he had not finished his search for a shooter, victims, or any weapons. Neither Harris nor Ms. Jones had showed the police any physical injuries that would explain the blood smears in the house. The police did not know if the shooter was Harris or Ms. Jones or someone else. Although Harris was later

handcuffed and secured in the back of a patrol car, Ms. Jones was not. Moreover, according to testimony found credible, there is a need for officers to protect themselves and others against the risk of harm from both the victim and the suspect in a domestic dispute. Thus, it was reasonable for the police to continue their search for a shooter, a victim, "and any weapon that might be used either against them or against other people in the [residence being searched]." *United States v. Bass*, 315 F.3d 561, 564 (6th Cir. 2002). Unlike the circumstances in *United States v. Johnson*, 22 F.3d 674 (6th Cir. 1994), the police here did not have a victim who told them that she was alone in the residence, what had happened to her, and where firearms could be found, thus eliminating the exigent circumstances that allowed the warrantless entry in the first instance.

## C.

This Court also rejects Harris's final argument that his Fourth Amendment rights were violated because, when the police found the handgun, they were exceeding the scope of the exigent circumstances that justified the warrantless entry in the first instance. Here, at the time the gun was discovered, the police had not completed their search for a suspect, victims, or weapons. During this continuing search, Sergeant Briley righted an overturned chair and stood on it to investigate a blood smear near the ceiling on the corner of a wall next to a six-foot tall entertainment center. From that position, he saw that the blood smear looked like a bloody hand print and noticed that it was in a spot where a person would balance or brace himself. He looked to his left and saw, in plain view, a pistol laying on top of the entertainment center and seized it. Because the seizure of the gun did not exceed the scope of the search for a shooter, victims, and weapons that justified the warrantless entry in the first instance, there is no Fourth Amendment violation.

Harris's reliance on *Arizona v. Hicks*, 480 U.S. 321 (1987), for a contrary conclusion is misplaced. In *Hicks*, the Court observed that the warrantless entry into the defendant's apartment and subsequent search for a shooter, victims, and for weapons was justified by exigent circumstances. During the search, the police moved stereo equipment to obtain concealed serial numbers that would allow them to then ascertain whether the equipment was stolen. This movement, the Court held, "did constitute a 'search' separate and apart from the search for the shooter, victims, and weapons that was the lawful objective of [the officer's] entry into the apartment." *Id.* at 324-25. Unlike the police in *Hicks*, Sergeant Briley's conduct did not constitute a search "separate and apart from the search for the shooter, victims, and weapons that was the lawful objective of his entry" into the house. *Id.*

Harris's reliance on *Mincey v. Arizona*, 437 U.S. 385 (1978), and *Thompson v. Louisiana*, 469 U.S. 17 (1984), is also misplaced. In *Mincey,* the Court held that evidence seized during a four-day warrantless search, conducted after the exigent circumstances that justified an earlier warrantless entry no longer existed, violated the Fourth Amendment and thus should have been suppressed. *Mincey*, 437 U.S. at 392-93. In *Thompson*, the police were allowed into a home by the defendant's daughter in response to a homicide/attempted suicide report. After the victim and injured defendant were transported to the hospital, officers returned to the scene, re-entered the home, and conducted a two-hour investigation, seizing a pistol from a dresser drawer, a torn up note from a wastepaper basket, and a letter "folded up inside an envelope containing a Christmas card on top of a chest of drawers." *Thompson*, 469 U.S. at 19. No one had given consent to this subsequent two-hour investigative search, and the police had not obtained a search warrant. *Id.* The *Thompson* Court held that the search violated the Fourth Amendment because it was conducted without the benefit

of a search warrant, and the evidence was not "discovered in plain view while the police were assisting [the defendant] to the hospital, nor was it discovered during the 'victim-or-suspect' search that had been completed by the time the homicide investigators arrived." *Id.* at 22.

Unlike the seizures found unconstitutional in *Hicks, Mincey* and *Thompson*, the seizure of the handgun here occurred while the exigent circumstances that justified the warrantless entry in the first instance still existed and was within the scope of those exigencies. The Supreme Court "has indicated that the plain view exception permits the warrantless seizure of 'objects dangerous in themselves'", and this Court has held that "a police officer who discovers a weapon in plain view may at least temporarily seize that weapon if a reasonable officer would believe, based on specific and articulable facts, that the weapon poses an immediate threat to officer or public safety." *United States v. Bishop*, 338 F.3d 623, 626, 628 (6th Cir. 2003) (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 472 (1971)). Just like the officer in *Bishop*, Sergeant Briley was "lawfully positioned when the gun came into plain view." *Id.* at 628. Considering the totality of the circumstances and the inherent necessities of the situation at the time, the district court properly concluded that Sergeant Briley's seizure of the handgun was reasonable.

**III.**

For the foregoing reasons, we affirm the district court's decision.