RECOMMENDED FOR PARTIAL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2001 FED App. 0146P (6th Cir.)
File Name: 01a0146p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,
  *Plaintiff-Appellee,*

  *v.*

JEFFREY RIDDLE (99-3405);
LAVANCE TURNAGE
(99-3406); BERNARD
ALTSHULER (99-3439),
  *Defendants-Appellants.*

Nos. 99-3405/
3406/3439

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 97-00385—Kathleen McDonald O'Malley,
District Judge.

Argued: February 1, 2001

Decided and Filed: May 4, 2001

Before: GUY, NORRIS, and SILER, Circuit Judges.

_____

**COUNSEL**

**ARGUED:** Albert A. Giuliani, Cleveland, Ohio, John
Patrick Parker, Cleveland, Ohio, Timothy F. Sweeney,
Cleveland, Ohio, for Appellants. Julia J. Stiller, UNITED

STATES DEPARTMENT OF JUSTICE, ORGANIZED CRIME & RACKETEERING SECTION, Washington, D.C., for Appellee. **ON BRIEF:** Albert A. Giuliani, Cleveland, Ohio, John Patrick Parker, Cleveland, Ohio, Timothy F. Sweeney, Cleveland, Ohio, for Appellants. Julia J. Stiller, Frank J. Marine, UNITED STATES DEPARTMENT OF JUSTICE, ORGANIZED CRIME & RACKETEERING SECTION, Washington, D.C., Craig S. Morford, ASSISTANT UNITED STATES ATTORNEY, Cleveland, Ohio, for Appellee.

---

## OPINION

---

ALAN E. NORRIS, Circuit Judge. Defendants Bernard Altshuler, Jeffrey Riddle, and Lavance Turnage were convicted by a jury of RICO, RICO conspiracy (18 U.S.C. § 1962(c) & (d)), and conducting an illegal gambling business (18 U.S.C. § 1955), and Riddle and Turnage of committing a violent crime in furtherance of racketeering (18 U.S.C. § 1959). They appeal on several grounds. They argue that the district court erred when it permitted them to be absent during voir dire, and they attack their RICO and violent crime convictions on the grounds that there was an insufficient connection with interstate commerce. They also claim that the evidence was insufficient to support certain counts against them and that the district court erred when it allowed the testimony of a witness after the government had concluded a plea bargain with him, when it did not give a conspiracy withdrawal jury instruction, and when it sentenced them without presentence reports. We affirm the district court.

Because resolution of defendants' issues concerning their voir dire absence and the interstate commerce requirements may have precedential value, those issues will be addressed below. The remaining issues raised by defendants are addressed in an unpublished appendix to this opinion.

Biondillo's murder and the Strollo enterprise, and we have determined above that the enterprise sufficiently affected interstate commerce.

> 3. *18 U.S.C. § 1955 (Illegal Gambling Business) (Altshuler and Riddle)*

This court has examined 18 U.S.C. § 1955 after *Lopez* and found it to be a valid exercise of congressional Commerce Clause power. *United States v. Wall*, 92 F.3d 1444, 1452 (6th Cir. 1996). In *Wall*, we noted that although the gambling statute does not contain a jurisdictional element, it addresses a commercial activity (unlike the *Lopez* statute). Furthermore, its legislative history provides congressional findings of illegal gambling's effect on interstate commerce, findings that were lacking in the Gun-Free School Zones Act. *Id.* at 1449-50. Defendants recognize the futility of their challenge in light of *Wall*, but urge the court to reconsider *Wall*; this we cannot do absent an en banc rehearing. *United States v. Smith*, 73 F.3d 1414, 1418 (6th Cir. 1996). Any as-applied challenge is irrelevant since § 1955 does not contain a jurisdictional element and the prosecution need not put on evidence of a particular connection with interstate commerce. *See Ables*, 167 F.3d at 1028 (rejecting a § 1955 defendant's premise that a "criminal statute constituting a valid exercise of congressional authority under the Commerce Clause may nevertheless be unconstitutional as applied to a particular defendant when the statute's jurisdictional requirements have been met").

## III.

For the foregoing reasons, the rulings of the district court with respect to defendants' voir dire absence and the interstate commerce elements of 18 U.S.C. §§ 1962, 1955, and 1959 are **affirmed**.

18 U.S.C. § 1959(a). The statute defines "enterprise" as an entity which is "engaged in, or the activities of which affect, interstate or foreign commerce." 18 U.S.C. § 1959(b)(2).

We agree with the government that the jurisdictional provision in the enterprise definition distinguishes the statute from *Lopez*, but this court has not yet determined what degree of connection to interstate commerce is required under § 1959. The courts of appeals for other circuits have applied the de minimis standard for the underlying RICO violation without requiring the violent act to have a connection with interstate commerce. In *United States v. Gray*, 137 F.3d 765 (4th Cir. 1998), the Court of Appeals for the Fourth Circuit affirmed a § 1959 conviction based on murder in furtherance of a drug conspiracy because it found evidence sufficient to "meet the minimal standard required to satisfy the interstate commerce requirement of § 1959(b)(2)" when the murder victim was a heroin addict who robbed a stash house. *Id.* at 773. Because the government presented evidence that heroin is produced from foreign and not local poppies, the interstate commerce requirement was met. *Id.* at 772-73.

The Court of Appeals for the Second Circuit also affirmed a § 1959 conviction for murders without requiring the murders to impact interstate commerce. Instead, the court required the predicate act (murder) to "bear a strong relationship to racketeering activity that affects interstate commerce[.]" *United States v. Mapp*, 170 F.3d 328, 336 (2d Cir.), *cert. denied*, 528 U.S. 901 (1999). The court found that the murders furthered a racketeering enterprise which was involved in robbing a business "engaged in interstate commerce by selling goods that had been obtained from out of state." *Id.* This connection to interstate commerce sufficed. We agree with the Courts of Appeals for the Second and the Fourth Circuits that § 1959's requirements are met if the government establishes a connection between the § 1959 act of violence and a RICO enterprise which has a de minimis interstate commerce connection. The government has done so here; Riddle does not contest the connection between

## I.

This is a case about three actors in the Lenine Strollo branch of La Cosa Nostra (LCN) in Youngstown, Ohio. Strollo ran several types of gambling in the enterprise, including a numbers lottery and dice games, some of which were played after-hours at several establishments, mainly Sharkey's; Jeff, Butch, and Jeff's; and the Greek Coffee House. These games had operated in Campbell, Ohio, since at least the 1950s, and Strollo became more involved as his political influence in the community grew, until he gained sole control after his release from prison in 1991.

Strollo came to rely on defendant Altshuler and another associate named Lawrence Garono in the gambling enterprise. Altshuler ran or supervised most dice games and "stag" parties (games to raise money for a particular cause or event) when he was not in prison, and in the mid-1990s when he was released from prison, Altshuler took control of the ailing gambling business, in part because he suggested he would be able to attract African-American drug dealers to the tables. To assist him, Altshuler recruited Riddle and Turnage, who were accepted in the drug dealing community. Together they converted Sharkey's into a nightclub with a craps game, but the undertaking failed. They had more success with gambling at the restaurant called Jeff, Butch, and Jeff's.

While Strollo built his business, Ernie Biondillo, as a self-designated successor to Strollo's murdered rival, began to conduct gaming events. Strollo felt that he was not getting his fair share, and he decided to kill Biondillo, delegating the task to Garono and then to Altshuler, who gave the job to Riddle. Riddle in turn involved Turnage. Riddle, Turnage, and another associate, George Wilkins, surveilled Biondillo and set out one day with guns to kill him; their efforts came to naught when they could not find Biondillo. Riddle subsequently decided he should not be present at the shooting and found a substitute; Turnage, Wilkins, and the substitute

met on June 3, 1996, blocked off Biondillo's car, and shot and killed him.

Members of the enterprise had been enjoying a certain amount of protection from the Mahoning County prosecutor, who unexpectedly lost the election in 1996 to a former police officer named Paul Gains. In light of several pending cases against enterprise members, including a case against Turnage, Strollo's contact with the prosecutor's office stated that the only solution was to kill Gains before he assumed office. Strollo passed the word on to Altshuler, who replied, "We'll take care of it." Riddle enlisted Turnage and Wilkins, and in October 1996, the trio went to find Gains at a restaurant in Youngstown to kill him; they had to abandon their plan, however, when they found the area full of police. Turnage gave up on having his case fixed, pleaded guilty to robbery, and went to jail. Riddle then recruited two other men to kill Gains, but they bungled the attempt, leaving Gains wounded but alive.

On December 10, 1997, the government filed an indictment against Strollo and nineteen of his associates, later replaced by a superseding indictment against thirteen defendants. The indictment charged Altshuler, Riddle, and Turnage with violations of 18 U.S.C. § 1962(c) and (d) (RICO) and § 1955 (illegal gambling business), and Riddle and Turnage with violation of 18 U.S.C. § 1959 (violent crime in aid of racketeering).

On December 2, 1998, in a pretrial conference, the parties requested the use of a juror questionnaire. The government asked for an anonymous jury, and Strollo's counsel asked that all potential jurors be questioned individually in the court's chambers. The court noted that United States Marshals would have to accompany defendants wherever they went, and the Marshals' presence in the court's chambers might prejudice defendants by suggesting to potential jurors that defendants were dangerous. Counsel responded that it would be in defendants' interest to waive their right to be present in order

the Youngstown murder victim Biondillo; the enterprise extorted money from a victim who sold fireworks in New York; and the government alleged that the Pittsburgh mafia family was involved in the enterprise (although all of those charged were Ohio residents). Given the low threshold for a de minimis interstate commerce connection, the requirement has been met in this case. *Cf. United States v. Mills*, 204 F.3d 669, 672-73 (6th Cir. 2000) (finding the de minimis nexus sufficient under the Hobbs Act when there was a "realistic probability" that sheriff's deputies from whom bribes were extorted would turn to an interstate lender recommended by the defendant sheriff in order to pay the bribes).

2.  *18 U.S.C. § 1959 (Violent Crimes in Aid of Racketeering) (Riddle)*

Riddle claims that 18 U.S.C. § 1959 is directly controlled by *Lopez* and that his conviction is invalid because the basis for his § 1959 conviction—the murder of Biondillo—had no connection with interstate commerce. The government counters that § 1959 expressly contains jurisdictional elements, thus distinguishing it from *Lopez*.

The statute governing violent crimes in aid of racketeering activity states:

Whoever, as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value from an enterprise engaged in racketeering activity, or for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity, murders, kidnaps, maims, assaults with a dangerous weapon, commits assault resulting in serious bodily injury upon, or threatens to commit a crime of violence against any individual in violation of the laws of any State or the United States, or attempts or conspires so to do, shall be punished [according to the sentences that follow].

but other courts have confirmed that a de minimis connection is still sufficient. *See, e.g.*, *United States v. Juvenile Male*, 118 F.3d 1344, 1348 (9th Cir. 1997) ("we conclude that all that is required to establish federal jurisdiction in a RICO prosecution is a showing that the individual predicate racketeering acts have a de minimis impact on interstate commerce"); *United States v. Miller*, 116 F.3d 641, 674 (2d Cir. 1997) (holding that because drug trafficking affects interstate commerce, a RICO claim based on drug trafficking need establish only a de minimis connection between the individual transaction and interstate commerce).

We have found a de minimis connection to interstate commerce to be sufficient under similar statutes after *Lopez*. *See United States v. Ables*, 167 F.3d 1021, 1030 (6th Cir. 1999) (applying a de minimis standard to 18 U.S.C. § 1956 (money laundering), which involves financial transactions that "in any way or degree affect[] interstate or foreign commerce" or involve "the use of a financial institution which is engaged in, or the activities of which affect, interstate or foreign commerce in any way or degree"); *United States v. Wall*, 92 F.3d 1444, 1450 n.13 (noting in dicta that statutes like the carjacking statute, which "require[s] that the government prove that the activities at hand substantially relate to interstate commerce," call for a "low threshold of proof of interstate relation"); *United States v. Smith*, 182 F.3d 452, 456 (6th Cir. 1999) (stating a de minimis standard for violations of the Hobbs Act, 18 U.S.C. § 1951, which requires robberies to "affect[] commerce"); *but see United States v. Wang*, 222 F.3d 234, 239 (6th Cir. 2000) (requiring a "substantial" connection in Hobbs Act cases when an individual, rather than a business, is the victim).

We hold that a de minimis connection suffices for a RICO enterprise that "affects" interstate commerce. The question then is whether the government has met that burden in this case. The Ohio-based enterprise here purchased Pennsylvania lottery tickets to protect against losses in the illegal gambling business; the members sold in Pennsylvania a ring taken from

to preserve the benefit of individual questioning without the potential prejudice of the Marshals' security. The court agreed and instructed the lawyers to tell the court in writing by January 7, 1999, if the defendants objected to this procedure. There were no objections, and at a February 11, 1999, meeting, defense counsel discussed the proposed voir dire procedure with their clients, at the court's request, in a holding cell and reported to the court that defendants wished to proceed as agreed. The court issued a written order confirming the waiver.

The prospective jurors then completed under oath a questionnaire of forty-six pages, developed with the input of defense counsel. Counsel agreed to strike a total of sixty-six jurors for cause on the basis of the questionnaires, which were available to defendants during the screening process.

On February 23, 1999, the court began individually questioning the remaining jurors in chambers, one by one, with defense counsel present; the individual voir dire process lasted for three days. Defendants were present in the courthouse on the morning of February 23, but at the start of the afternoon session on that day, defense counsel indicated to the court that defendants requested permission to return to jail until the final stages of the jury selection process. The court, after confirming with counsel defendants' waiver of their right to be in the courthouse, granted defendants' request. On March 1, defendants returned to the courtroom for the exercise of peremptory challenges. These challenges were exercised in side-bar conferences in the open courtroom, where defendants were present.

During the screening of the jurors, the government had concluded a plea agreement with Strollo that gave him twelve to fifteen years in prison in exchange for his testimony against the others, and dropped a forfeiture charge in the amount of ten million dollars, plus various properties. The trial began on March 1, 1999, and Strollo fulfilled his bargain by testifying. On March 12, 1999, Altshuler, Riddle, and

Turnage were convicted on all counts and sentenced to life imprisonment. After the jury verdict, the court did not order a presentence report, stating that it had adequate information already from previous proceedings. The court offered to sentence the defendants the following week, but defense counsel agreed to do the sentencing that day. The court gave the counsel time to get the defendants' consent to the sentencing procedure, and counsel made no objections. Defendants were sentenced to life imprisonment without release, with a five-year sentence for illegal gambling to run concurrently. Defendants appeal their convictions and sentences.

## II.

### A. Voir Dire

Defendants argue that they did not effectively waive their right to be present during voir dire because they did not waive the right in person before the trial court. Defendants are essentially asserting that a trial court must engage a defendant in an on-the-record colloquy before allowing the defendant to absent himself from voir dire, and that failure to do so is a fundamental structural error. We decline to so hold.

A criminal defendant has a constitutional right to be "present at all stages of the trial where his absence might frustrate the fairness of the proceedings[.]" *Faretta v. California*, 422 U.S. 806, 819 n.15 (1975); *United States v. Gibbs*, 182 F.3d 408, 436 (6th Cir. 1999). Federal Rule of Criminal Procedure 43 builds on this right and mandates that "[t]he defendant shall be present . . . at every stage of the trial including the impaneling of the jury and the return of the verdict." FED. R. CRIM. P. 43(a). This right is more extensive than that guaranteed by the Constitution. *Gibbs*, 182 F.3d at 436.

The right to be present may be waived. Rule 43 allows the court to consider the defendant to have waived the right to be present if the defendant has been initially present and then

### 1. 18 U.S.C. § 1962 (RICO) (Altshuler and Riddle)

Altshuler and Riddle argue that their RICO convictions under 18 U.S.C. § 1962(c) and (d) were invalid because the government was obliged under *Lopez* to show a substantial effect on interstate commerce, and it failed to do so, alleging only an intrastate enterprise. Section 1962(c) states that

[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c). Subsection (d) makes it a crime to conspire to violate (c). Because the statute contains a jurisdictional requirement (the enterprise must be engaged in or affect commerce), it is not controlled by *Lopez*, and, according to the Supreme Court, when a RICO enterprise is "engaged in" interstate commerce, the government does not need to show that the enterprise's effect on commerce is "substantial." *United States v. Robertson*, 514 U.S. 669, 671-72 (1995). *Robertson* affirmed a RICO conviction based on the operations of an Alaska gold mine, which used out-of-state workers and sent gold out of Alaska, and thus engaged in interstate commerce. *Id.* The Court in *Robertson* reserved the question of whether a RICO prosecution based on an enterprise that "affects" interstate commerce must show a "substantial" effect. *Id.*

Since the Youngstown enterprise here is not "directly engaged in the production, distribution, or acquisition of goods or services in interstate commerce," *id.* at 672, we consider the requirements for an enterprise that affects interstate commerce, rather than one that is engaged in interstate commerce. The question of a RICO enterprise's necessary relationship to interstate commerce has not been expressly addressed by this court after *Robertson* and *Lopez*,

subject matter jurisdiction, that is, the court's power to hear a case.  Rather, a claim of an insufficient connection to interstate commerce is a challenge to one of the elements of the government's case and is therefore considered a claim about the sufficiency of the evidence.  *See United States v. Degan*, 229 F.3d 553, 556 (6th Cir. 2000) (explaining that defendant's challenge to an interstate commerce nexus in a conviction under 18 U.S.C. § 1958(a) (murder for hire) had no effect on subject matter jurisdiction but was a claim about the sufficiency of the evidence); *United States v. Martin*, 147 F.3d 529, 531-32 (7th Cir. 1998) (stating that a challenge to 18 U.S.C. § 844(i)'s interstate commerce element did not affect subject matter jurisdiction).  Defendants' claim is therefore best understood as a facial challenge to the constitutionality of §§ 1959 and 1955 and an as-applied challenge to the sufficiency of the government's evidence in the §§ 1959 and 1962 convictions.

In attacking the statutes, defendants rely on the Supreme Court's opinion in *United States v. Lopez*, 514 U.S. 549 (1995), which invalidated the Gun-Free School Zones Act (18 U.S.C. § 922(q) (1994)) because Congress had insufficiently established a connection with interstate commerce. There, the Supreme Court identified three categories of activities that Congress may regulate under its commerce power:  (1) "the use of the channels of interstate commerce"; (2) "the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities"; and (3) "those activities having a substantial relation to interstate commerce." *Id.* at 558-59 (citation omitted).  The statute in *Lopez* fell into the third category, and the Court determined that activities regulated within this category had to "substantially affect" interstate commerce. *Id.* at 559.  The statute at issue did not survive constitutional scrutiny for two reasons: it was a criminal statute that had nothing to do with commerce, and it lacked a "jurisdictional element which would ensure, through case-by-case inquiry, that the [activity] in question affects interstate commerce." *Id.* at 561.

voluntarily leaves after the trial has commenced, "whether or not the defendant has been informed by the court of the obligation to remain during the trial." FED. R. CRIM. P. 43(b). Defendants attempt to avoid the conclusion that they waived their right when they consented to the use of questionnaires and requested to leave the courthouse during voir dire by saying that waiver by their counsel was not effective as their waiver.  This court has, however, held otherwise.  In *United States v. Gallo*, 763 F.2d 1504 (6th Cir. 1985), we agreed with a district court's determination that a defendant had effectively waived his right to be present when his defense counsel relayed the hospitalized defendant's waiver of presence to the court. *Id.* at 1529.

Of course the waiver of this right, as with other constitutional rights, must be knowing and voluntary. *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938) ("A waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege").  Given the choices presented to the defendants and their strategic option to be absent to avoid prejudice, the voluntariness of their decision is clear. Moreover, as Rule 43 suggests, the Constitution does not require a colloquy on the record to establish a knowing waiver of the right to be present. *Taylor v. United States*, 414 U.S. 17, 19-20 (1973).  In *Taylor*, a defendant failed to return for the afternoon session of his trial, which continued in his absence the following day.  The Supreme Court found an effective waiver in his voluntary absence, even though the trial court did not warn him of his rights and the consequences of his absence.  The Supreme Court reasoned that it was "wholly incredible" that the defendant, who had been present at the start of his trial, was unaware of his right to be present. *Id.* at 20.  Similarly in *United States v. Gagnon*, 470 U.S. 522 (1985), a case involving an in-camera conference with a juror, the Supreme Court found that "respondents' total failure to assert their rights to attend the conference with the juror sufficed to waive their rights under Rule 43." *Id.* at 529; *see also United States v. Holyfield*, 802 F.2d 846, 849 (6th Cir. 1986) (affirming a conviction when the judge and counsel

conference-called the hospitalized defendant, who conversed with his lawyer and authorized his lawyer and the court to proceed in his absence).

In this case, defense counsel suggested defendants' absence, and the court allowed the waiver only after it instructed defense counsel to consult with their clients and then received assurance from defense counsel that the defendants waived their right to be present. To hold that such a waiver of a defendant's voir dire presence would be effective only after an on-the-record colloquy with the defendant would create a burdensome and impractical rule. Indeed, such a rule would effectively stop the proceedings whenever a defendant refused to return to court. We hold that defendants' waiver through their counsel of their right to be present during voir dire was effective.

Even if the waiver were not effective, the right to be present at voir dire is not one of those structural rights whose violation constitutes per se error. Rather, there must be prejudice in the absence to warrant reversal. *See Gibbs*, 182 F.3d at 437 (applying harmless error review to the exclusion of defendants from a portion of voir dire and plain error review to defendants' exclusion from peremptory challenges). Any error in a defendant's voir dire absence is not a "defect affecting the framework within which the trial proceeds," *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991), nor is it one of those errors that "necessarily render[s] a trial fundamentally unfair," *Rose v. Clark*, 478 U.S. 570, 577 (1986); *compare Gideon v. Wainwright*, 372 U.S. 335 (1963) (reversal required for the complete denial of trial counsel); *Tumey v. Ohio*, 273 U.S. 510, 535 (1927) (reversal required when a judge has a financial interest in conviction, despite a lack of indication that bias influenced decisions); *Vasquez v. Hillery*, 474 U.S. 254, 263-64 (1986) (discrimination in the grand jury is not subject to harmless error review); *McKaskle v. Wiggins*, 465 U.S. 168, 177-78 n.8 (1984) (denial of the right to self-representation at trial is not subject to harmless error review); *Waller v. Georgia*, 467 U.S. 39, 49 n.9 (1984)

(denial of the right to a public trial is not subject to harmless error analysis). To create an automatic reversal rule for voir dire absences would be to risk interference with the choices made by counsel and defendant for the defendant's benefit. Here, for instance, defendants' absence was part of a defense strategy to avoid any prejudice resulting from the appearance of heavy security during the questioning of the potential jurors. No purpose would be served by a per se rule that eliminated this solution to defendants' dilemma. Such a rule would also invite "sandbagging" by defendants seeking to win a reversal on issues never presented to the trial court. We decline to expand the limited list of structural rights whose violation constitutes per se error by adding the defendant's right to presence at voir dire.

*B. Interstate Commerce*

Altshuler and Riddle claim that several counts of their conviction should be reversed because the government did not sufficiently establish a link with interstate commerce. Specifically, they argue that the court lacked subject matter jurisdiction to convict them under 18 U.S.C. § 1962 (RICO) and 18 U.S.C. § 1955 (gambling), and Riddle under 18 U.S.C. § 1959 (violence in furtherance of racketeering)[1] because the government did not show a substantial effect on interstate commerce. Defendants raise their interstate commerce argument for the first time on appeal. The claim may only be reviewed for plain error. *See United States v. Gaydos*, 108 F.3d 505, 509 (3d Cir. 1997) (reviewing for plain error the claim that the evidence was insufficient to establish a connection to interstate commerce in an explosives case).

Defendants err in asserting that the interstate commerce argument goes to the court's subject matter jurisdiction. This court has explained that the interstate commerce requirement, while referred to as a "jurisdictional" element, does not affect

---

[1] Altshuler was not convicted under 18 U.S.C. § 1959.