*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 08a0151p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,
   *Plaintiff-Appellee/Cross-Appellant,*

   *v.*

RUSSELL WAYNE HUNT,
   *Defendant-Appellant/Cross-Appellee.*

Nos. 06-6300/6301

>

---

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 04-00135—Aleta Arthur Trauger, District Judge.

Argued: November 28, 2007

Decided and Filed: April 11, 2008

Before: MARTIN, SILER, and ROGERS, Circuit Judges.

---

**COUNSEL**

**ARGUED:** Kimberly S. Hodde, HODDE & ASSOCIATES, Nashville, Tennessee, for Appellant. Jimmie Lynn Ramsaur, ASSISTANT UNITED STATES ATTORNEY, Nashville, Tennessee, for Appellee. **ON BRIEF:** Kimberly S. Hodde, HODDE & ASSOCIATES, Nashville, Tennessee, Richard J. Braun, BRAUN & CROTWELL, PLLC, Nashville, Tennessee, for Appellant. Jimmie Lynn Ramsaur, ASSISTANT UNITED STATES ATTORNEY, Nashville, Tennessee, for Appellee.

   ROGERS, J., delivered the opinion of the court, in which SILER, J., joined. MARTIN, J. (pp. 12-15), delivered a separate opinion concurring in part and dissenting in part.

---

**OPINION**

---

   ROGERS, Circuit Judge. Following a jury trial, Russell Wayne Hunt was convicted of health care fraud in violation of 18 U.S.C. § 1347, conspiracy to commit health care fraud in violation of 18 U.S.C. § 371, and making false statements relating to health care fraud in violation of 18 U.S.C. § 1035. He was sentenced to five years of probation, a $6,000 fine, a $1,200 special assessment, and restitution in the amount of $151,161.78, to be paid jointly and severally with his co-conspirators. Hunt now argues that his convictions should be overturned because: (1) his Sixth Amendment right to present his own witnesses and establish his defense was violated by the Government's ensuring that two primary defense witnesses would not be available to testify at trial; (2) the district court erred by refusing to admit exculpatory hearsay statements made by a co-defendant; and (3) there was insufficient evidence to support his convictions. In the alternative,

1

Hunt contends that the restitution order must be modified because the district court incorrectly calculated the amount owed. For its part, the Government, in a cross-appeal, contends that the sentence imposed by the district court is substantively unreasonable. Hunt's arguments are unavailing, but the Government is correct that his sentence is substantively unreasonable. Therefore, we affirm Hunt's convictions while vacating his sentence and remanding the case for resentencing.

I.

At the times relevant to this case, Russell Wayne Hunt was a physician licensed to practice medicine in the state of Tennessee. This case revolves around his involvement with mobile diagnostic testing companies owned by Mark Noble, who pled guilty to making false statements related to health care matters. From 1999 until 2001, Noble was the operator and part owner of a mobile diagnostic testing company called Vascular Check, Inc. ("VCI"), and between 2002 and 2003, he was the owner and operator of an identical company known as Health Tech Screenings ("HTS"). Those companies performed carotid artery ultrasound tests, which allow doctors to determine whether there is blockage in the carotid artery that could lead to a stroke. The tests were performed throughout the state of Tennessee, typically at places like senior citizens' centers and trade shows. VCI and HTS both billed Medicare and Blue Cross/Blue Shield for the services. Medicare and private insurance only pay for diagnostic tests that have been determined to be medically necessary by a treating physician or a nurse practitioner or physician's assistant working under the license of a treating physician.

Hunt became acquainted with Noble in 1999, shortly after Hunt had opened his own private practice. Noble informed Hunt about the health fairs and corporate events that Noble's company attended, and Hunt decided that setting up a booth at such events would be a good way to market his new practice. Hunt's attendance at those events allowed him to become more familiar with Noble's enterprises by observing them. Eventually, Noble asked if Hunt would be willing to evaluate patients on behalf of Noble's company at those events. Hunt's role was to review a medical history questionnaire filled out by a patient, perform an examination on the patient, and then make a determination as to whether the carotid artery ultrasound test was medically necessary.

At some point in 2001, Hunt informed Noble that he was too busy in his private practice to continue seeing patients on behalf of Noble's company. Hunt provided Noble with a list of nurse practitioners and suggested that Noble hire someone off that list to see patients under Hunt's medical license. Noble never hired a nurse practitioner though. Instead, Noble simply began bringing the medical history questionnaires and the unsigned orders to Hunt after the tests had already been performed, and Hunt would then sign the orders without having seen the patients. After Hunt signed the orders without having seen or examined the patients, Noble would submit claims to Medicare in order to receive payment for the tests. For his trouble, Hunt received $10 per signature from Noble. If a particular patient had private insurance through Blue Cross/Blue Shield, Noble would submit a claim to that company for the test, and Hunt would also submit a claim for his "consultation" with the patient. In the claims that he submitted to Blue Cross/Blue Shield, Hunt billed under a consultation code that requires a face-to-face examination of the patient.

In 2002, the government began investigating Noble and his companies on suspicion of Medicare fraud. During the investigation, Hunt told special agents from the Department of Health and Human Services that he was not paid $10 per signed order, and that all of the tests had been ordered before they were performed. Neither statement was true. In addition, Hunt claimed that a nurse practitioner working under his license was examining the patients, although he admitted that he had never met that person, did not know that person's name, and had not confirmed that person's credentials.

As a result of the investigation, Hunt, Noble, and Patricia Reed, one of Noble's employees, were indicted in August of 2004 for health care fraud, conspiracy to commit health care fraud, and making false statements relating to health care matters. Noble subsequently pled guilty to making false statements relating to health care matters, and he was sentenced to 37 months in prison, three years of supervised release, and payment of restitution in the amount of $242,738. Reed pled guilty to assisting in making a false statement involving a federal health care program, and she was sentenced to four years of probation and ordered to pay restitution in the amount of $19,000. Dr. Bartee, another physician who signed orders for Noble's companies, negotiated a pretrial diversion agreement with the Government. Unlike Hunt, Dr. Bartee appears to have physically examined patients before ordering the tests, and he stopped signing orders for Noble in 2002 after becoming suspicious about the legality of Noble's conduct.

A superseding indictment of Hunt was issued on July 20, 2005. Hunt maintained his innocence and proceeded to trial. During the trial, he sought to have admitted into evidence two hearsay statements from an affidavit made by Noble during the investigation. In those statements, Noble said, "I don't feel Doctor Russell Hunt, Dr. Moore, Dr. Bartee did anything wrong," and "Dr. Hunt does not know that RN Haines [sic] is represented as a PA."[1] The district court ruled both statements inadmissible. Hunt also sought to elicit testimony from Noble and Dr. Bartee, but they both refused to testify on Fifth Amendment grounds. Dr. Bartee refused to testify because of concerns about how his testimony might affect his diversion agreement, which had not been finalized by the time of trial, and Noble refused to testify because of his exposure to potential prosecution in other districts.

After the jury convicted Hunt on all counts, his sentencing hearing was held on September 1, 2006. Although the Guidelines Range was from 27 to 33 months of imprisonment, the district court sentenced Hunt to five years of probation. In reaching that decision, the district court engaged in a lengthy discussion of the evidence that it believed to be indicative of a lack of fraudulent intent on Hunt's part. Ultimately, the district court concluded that Hunt had been "hoodwinked" by Noble. The district court also expressed great concern about the fact that several individuals whom the court considered to be equally culpable had not been prosecuted. The district court also appears to have given weight to the fact that Hunt would probably lose his medical license, as well as the fact that the carotid artery ultrasound tests performed on the patients did not hurt anyone and may have significantly helped many individuals. The district court also considered that Hunt was a well-liked and well-respected physician who worked hard to break out of his humble background. In addition to probation, the district court ordered Hunt to pay a $6,000 fine, a $1,200 special assessment, and restitution in the amount of $151,161.78, which he would owe jointly and severally with the other defendants.[2] Hunt was further ordered to pay $50,000 of the restitution within 60 days.

II.

The Government did not violate Hunt's Sixth Amendment right to present his own witnesses and establish a defense because there were no prosecutorial "actions aimed at discouraging defense witnesses from testifying . . . ." *United States v. Emuegbunam*, 268 F.3d 377, 400 (6th Cir. 2001) (citing *Webb v. Texas*, 409 U.S. 95, 98 (1972); *United States v. Thomas*, 488 F.2d 334, 336 (6th Cir.

---

[1] The latter statement refers to Diane Haynes, a registered nurse who worked for Noble. She was occasionally represented to patients as a physician's assistant.

[2] Hunt received $7,678.88 from Blue Cross/Blue Shield for the "consultations" that he billed, and he was paid a total of $3,710 by Noble's companies. Therefore, Hunt's profits were at least $11,388.88. Noble's companies were paid a total of $113,247.85 from Medicare for the tests ordered by Hunt, and Noble's companies were also paid a total of $30,235.05 from Blue Cross/Blue Shield for tests ordered by Hunt. Altogether, the total loss sustained by Medicare and Blue Cross/Blue Shield as a result of Hunt's actions was $151,161.78. Hunt does not dispute these calculations.

1973)).  It is true that two potential defense witnesses — Mark Noble and Dr. Bartee — refused to testify on Fifth Amendment grounds, but the Government did nothing to discourage or inhibit them from testifying.  Indeed, the Government was not even the cause-in-fact of their refusals to testify.

Hunt argues that the Government deprived him of his rights by intentionally placing Noble and Dr. Bartee in positions where they would be likely to assert their Fifth Amendment rights not to testify.  Specifically, Hunt points out that the Government continued Noble's sentencing hearing until after Hunt's trial and that the Government had failed to reach a diversion agreement with Dr. Bartee prior to Hunt's trial.  This argument, however, ignores key facts.  First, the Government said at the pretrial hearing that it had no objection to sentencing Noble before the trial.  Noble's lawyer, however, indicated to the court that his client would refuse to testify regardless of whether or not he had been sentenced because there was a chance that he might be prosecuted for related conduct in other districts.[3]  Second, the Government and Dr. Bartee failed to reach an agreement on pretrial diversion prior to Hunt's trial not because of any fault on the part of the Government, but because Dr. Bartee himself was delaying the process so that he could determine how best to structure the agreement in order to avoid disciplinary issues with the Tennessee Board of Medical Examiners.  Thus, because the facts indicate that the Government did not do anything to ensure that Noble and Dr. Bartee would be unavailable to testify at trial, the Government did not interfere unconstitutionally with Hunt's right to present his own witnesses and establish his defense.

## III.

There was also no error in the district court's refusal to admit the two hearsay statements from Noble's affidavit.  Hunt alleges that the statements are admissible under Rule 804(b)(1) or Rule 807 for the truth of the matter asserted, or in the alternative, under Rule 806 for the purpose of impeachment.  We review such admissibility determinations for abuse of discretion.  *United States v. Ganier*, 468 F.3d 920, 925 (6th Cir. 2006).  Because neither statement is admissible under any of the Federal Rules of Evidence, it cannot be said that the district court abused its discretion in excluding them.

Preliminarily, we question whether the affidavit statements satisfy the general requirements for admissibility.  The statement that "Dr. Hunt does not know that RN Haines [sic] is represented as a PA," is arguably not admissible as not based on the witness's personal knowledge.  Fed. R. Evid. 602.  Noble's statement that "I don't feel Doctor Russell Hunt, Dr. Moore, Dr. Bartee did anything wrong," is arguably not admissible as an opinion by a lay witness that is not "helpful to a clear understanding of the witness' testimony or the determination of a fact in issue."  Fed. R. Evid. 701; *see also Torres v. County of Oakland*, 758 F.2d 147, 150 (6th Cir. 1985) (a lay opinion is not helpful if it "would merely tell the jury what result to reach . . . .").

---

[3]Noble was exposed to further prosecution in the Eastern District of Tennessee because he committed some of the same criminal acts in that district as he did in the Middle District.  Therefore, his assertion of the Fifth Amendment was valid because he had reasonable cause to apprehend a real danger of incriminating himself if he were to be prosecuted in the Eastern District.  *See In re Morganroth*, 718 F.2d 161, 167 (6th Cir. 1983).  Hunt contends, however, that Noble's assertion of his Fifth Amendment right was not valid because the policies expressed in the U.S. Attorney Manual made it highly unlikely that Noble would actually be prosecuted in the Eastern District.  That argument ignores the fact that the U.S. Attorney Manual is intended only for internal guidance and does not affect the rights of parties.  *See* U.S. Attorney Manual, § 9-2.031(F).  Therefore, Hunt cannot force Noble to testify simply because the Manual expresses a general policy against prosecuting him in another district.  Aside from that fact, however, the Manual provides that the general policy can be disregarded in certain situations.  It is possible that Noble's testimony could uncover new facts or paint his conduct in a new manner so as to place him in one of those scenarios.  Moreover, Noble's situation could have fit within one of those scenarios even without any new information arising from his testimony.  As a result, Noble had reasonable cause to apprehend a real danger of incriminating himself.

Assuming, however, that the affidavit statements meet the general admissibility requirements of Rules 602 and 701, they are nonetheless not admissible because they are hearsay. First, the prior testimony exception is not applicable. Rule 804(b)(1) permits hearsay to be received into evidence if the declarant is unavailable to testify as a witness and the hearsay was given as testimony "at another hearing of the same or a different proceeding, or in a deposition taken in compliance with law in the course of the same or another proceeding . . . ." Fed. R. Evid. 804(b)(1). The affidavit in question was not given at a hearing or in a deposition. Instead, it was made during an interview with government agents. A hearing connotes some kind of adversarial proceeding presided over by an impartial third party, while "deposition" is a term of art referring to the out-of-court adversarial questioning of a witness under oath. Writing and signing a narrative affidavit during an interview with Government officers plainly is not the same as testimony given during a hearing or deposition.

Furthermore, the statements fail Rule 804(b)(1)'s additional requirement that the party against whom the former testimony is offered have had "an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination." *Id.* Although Hunt is required to show that the Government had a similar motive to develop the testimony at trial as it had at the time the affidavit was made, *see United States v. Salerno*, 505 U.S. 317, 322 (1992), he has presented no argument on that issue. Indeed, it is unlikely that he could demonstrate that the Government agents who were conducting the investigation had a similar motive to develop the statements as the prosecution had at trial. The motives of Government agents who are talking to a suspect during an investigation are different from the motives of prosecutors at trial. In the former situation, the Government agents desire to obtain information from the suspect without revealing the information that they already have. Therefore, it is not necessarily in their best interest to cross examine the declarant or to try to paint a picture of the truth as they understand it. At trial, however, it is in the Government's best interest to lay all of its cards on the table so that the unvarnished truth can be presented publicly to the jury. Because Hunt has not demonstrated that the Government had a similar motive, and because the statements were not given at a hearing or deposition, the statements are not admissible under Rule 804(b)(1).

Additionally, the statements are not admissible under Rule 807, the residual hearsay exception. Rule 807 allows for the admission of hearsay statements that are not specifically covered by Rule 803 or 804 so long as: (1) they have equivalent circumstantial guarantees of trustworthiness, (2) they are offered as evidence of a material fact, (3) they are more probative on the point for which they are offered than any other evidence which the proponent can procure through reasonable efforts, and (4) their admission will best serve the general purposes of the Rules of Evidence and the interests of justice. Fed. R. Evid. 807. The district court in this case made a finding that the hearsay statements at issue lack trustworthiness, and Hunt has not demonstrated that finding to be clearly erroneous. Hunt argues that it is reasonable to conclude that the statements are truthful because they tend to incriminate the declarant, Noble, while exculpating Hunt. However, it is at least equally reasonable to conclude that the statements are not trustworthy. It would not be bizarre for an individual to lie in order to protect another individual with whom he has a business relationship. More importantly, a statement is not rendered trustworthy simply by the fact that it tends to exculpate one other than the declarant. This principle is seen clearly in Rule 804(b)(3), which says that a statement that exposes the declarant to criminal liability while exculpating the accused is not admissible unless corroborating circumstances indicate its trustworthiness. The absence of such corroborating circumstances in this situation indicates that the affidavit statements lack circumstantial guarantees of trustworthiness equivalent to those found in Rule 803 or 804. Thus, it is not clear that the statements bear the requisite trustworthiness. The district court accordingly made a reasonable decision to exclude the statements on the basis of untrustworthiness. The reasonableness of that decision leads to the conclusion that it was not an abuse of discretion.

The statements are also not admissible under Rule 806 for the purpose of impeachment. Rule 806 allows for the impeachment of hearsay evidence in any manner that would be allowed if the

hearsay declarant had testified as a witness, and Hunt argues that the two statements at issue should be admitted to impeach certain statements made by Noble on an undercover video that was made by the Government during its investigation and shown to the jury at trial. At one point on the video, Noble states that Hunt sometimes examines the patients himself and sometimes sends a physician's assistant under his license. Hunt argues that this statement is inconsistent with Noble's affidavit statement about RN Haynes, and that the affidavit statement could therefore be introduced to impeach the videotaped statement. The argument fails because there does not appear to be any inconsistency between the two statements. It is entirely possible for Hunt to send a physician's assistant under his license while also being unaware that RN Haynes is sometimes represented as a physician's assistant. In any event, the district court's determination that there were no inconsistencies between the statements was neither a clearly erroneous determination nor an abuse of discretion. Because it is not clear that the statements are inconsistent, the district court properly determined that the affidavit statement about RN Haynes was not admissible under Rule 806. Hunt also alleges that Noble's statement that Hunt did not do anything wrong is inconsistent with various statements on the videotape concerning Hunt's knowledge, but he fails to point out any particular inconsistencies. We therefore uphold the district court's ruling on that issue as well.

Finally, the Confrontation Clause does not compel the admission of the affidavit statements for the purpose of impeachment. Although Hunt is correct that the purpose of the Confrontation Clause is to guarantee defendants an opportunity to cross-examine and attack the credibility of witnesses and hearsay declarants, it is also true that the Confrontation Clause leaves the trial judge with authority to place reasonable limits on cross-examination. *See Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986). What is important is that the defendant have "an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) (per curiam). Hunt had ample opportunity throughout the trial, particularly during his own testimony, to engage in the effective impeachment of Noble's credibility. Therefore, the district court's exclusion of the inadmissible affidavit statements was not a violation of Hunt's confrontation rights.

IV.

Hunt's sufficiency-of-the-evidence argument also fails because a "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). In reviewing the sufficiency of the evidence, this court must view the evidence in the light most favorable to the prosecution. *See id*. A defendant faces a very heavy burden in challenging the sufficiency of the evidence, *see United States v. Garrido*, 467 F.3d 971, 984 (6th Cir. 2006) (citing *United States v. Tocco*, 200 F.3d 401, 424 (6th Cir. 2000)), and an analysis of Hunt's three offenses shows that he has not met that burden.

A.  Health Care Fraud

There is sufficient evidence to support Hunt's conviction of health care fraud because circumstantial evidence allows a rational trier of fact to find beyond a reasonable doubt that Hunt caused bills to be submitted to Medicare and Blue Cross/Blue Shield for patients that he had never seen and tests that had not been determined to be medically necessary. To obtain a conviction for health care fraud under 18 U.S.C. § 1347, the Government must prove that Hunt: "(1) knowingly devised a scheme or artifice to defraud a health care benefit program in connection with the delivery of or payment for health care benefits, items, or services; (2) executed or attempted to execute this scheme or artifice to defraud; and (3) acted with intent to defraud." *United States v. Raithatha*, 385 F.3d 1013, 1021 (6th Cir. 2004), *vacated on other grounds*, 543 U.S. 1136 (2005). Additionally, one who aids and abets another in committing an offense is punishable as a principal. 18 U.S.C. § 2. Aiding and abetting requires: "(1) an act by a defendant which contributes to the execution of a crime; and (2) the intent to aid its commission." *United States v. Davis*, 306 F.3d 398, 409 (6th Cir.

2002) (quoting *United States v. Lowery*, 60 F.3d 1199, 1202 (6th Cir. 1995)). Thus, regardless of whether Hunt was actually the person who devised the fraudulent scheme, he is still guilty of health care fraud because the evidence is sufficient to support a finding that he contributed to the execution of the scheme with the intent to defraud.

Medicare and private insurance will only pay for diagnostic tests that have been ordered as medically necessary by a treating physician or a nurse practitioner or physician's assistant working under such a physician. There is ample evidence that Hunt defrauded Medicare and Blue Cross/Blue Shield by causing claims to be submitted for tests that had not been determined to be medically necessary. The Government's expert testified at trial that a determination as to medical necessity could not have been made solely based on the questionnaires filled out by the patients. Therefore, an in-person examination would have been required to make that determination. Hunt does not dispute that he did not examine the patients, but instead he claims that he lacked the requisite intent to defraud because he had a good-faith — albeit erroneous — belief that the patients were being examined on-site by a nurse practitioner. A rational trier of fact, however, could be convinced beyond a reasonable doubt that Hunt's claim is a sham. Tennessee law requires the relationship between a nurse practitioner and supervising physician to be governed by a written protocol, and both parties are required to review the protocol and sign a form saying that they understand it. In his trial testimony, Hunt admitted that he never went over any such protocol with the nurse practitioner who was allegedly seeing patients on his behalf. Because he never reviewed the protocol with the nurse practitioner — or even interacted with the alleged nurse practitioner in any way — a rational jury could infer that Hunt knew that the nurse practitioner did not exist. That conclusion is also supported by Hunt's unbelievable assertion that he submitted a list of names to Noble and believed on blind faith that Noble had hired a nurse practitioner from that list. It is highly unlikely that a physician would allow a nurse practitioner to practice under his license without ever having checked the credentials — or the identity, for that matter — of the nurse practitioner. In other words, a jury could rationally conclude that Hunt was not concerned about the identity or credentials of the nurse practitioner because he knew that the nurse practitioner did not exist. Therefore, a rational jury could conclude that Hunt ordered tests with knowledge that the patients had never been examined by him or a nurse practitioner or physician's assistant working under his license. It follows that there is sufficient evidence to conclude that Hunt intentionally contributed to the commission of health care fraud by causing claims to be submitted on the false pretenses that they had been determined to be medically necessary by a qualified medical professional.

The conclusion that Hunt acted with intent to defraud Blue Cross/Blue Shield is further buttressed by the fact that he submitted claims under a consultation code requiring a face-to-face examination of the patients. Julie Davis, Hunt's billing clerk, testified that it was Hunt who decided which codes to bill under. When Davis's testimony is combined with the rational conclusion that Hunt knew that neither he nor a nurse practitioner had seen the patients, a rational trier of fact could easily come to the conclusion that Hunt knowingly submitted improper billing codes in order to be paid for work that he had not actually performed. Hunt, however, claims that he was unknowledgeable about billing matters, that he relied completely on Davis, and that he made the innocent mistake of billing for a "consultation" when he should have billed for a "remote office visit." He further argues that the innocence of the mistake is demonstrated by the fact that the consultation code pays slightly less money than the remote office visit code. There is no evidence, however, to demonstrate that Hunt would have been entitled to receive payment even under the remote office visit code. There is no proof that a face-to-face examination is not required under the remote office visit code. On its face, the term "remote office visit" implies that the billing physician visited with the patient. The fact that the remote office visit code pays more than the consultation code is meaningless if Hunt was not entitled to bill for either code because he did not conduct a face-to-face examination of the patients. Thus, the evidence indicates that Hunt's fraudulent bills to BlueCross/Blue Shield were not simply innocent mistakes.

The absence of innocent mistake in Hunt's conduct is further confirmed by a phone call that he made to Laura Jarrell in the spring of 2005, which was after his indictment, but before trial. Jarrell testified that she received a strange and agitated answering machine message from Hunt and that when she returned the call, his office said that he just wanted to know if Jarrell remembered seeing Hunt at the 2002 Southern Women's Show, where Jarrell had received a carotid artery ultrasound test from HTS. Hunt's call to Jarrell could reasonably be interpreted as displaying consciousness of guilt and as an attempt to conceal unlawful activity by convincing Jarrell that she had seen Hunt in person. Such an interpretation constitutes valid circumstantial evidence of intent to defraud because this court has held that intent can be inferred "from efforts to conceal the unlawful activity . . . ." *See United States v. Davis*, 490 F.3d 541, 549 (6th Cir. 2007).

Finally, a critical consideration in weighing the sufficiency of the evidence on the health care fraud conviction is the fact that the case against Hunt essentially boils down to the jury's choice between believing Hunt's claims to have made innocent mistakes and the Government's circumstantial proof that he knowingly committed fraud. After witnessing Hunt's demeanor and testimony, the jury decided that it simply did not believe his excuses. The jury found the Government's story to be more credible, and that decision is entitled to a high degree of deference. *See United States v. Latouf*, 132 F.3d 320, 330-31 (6th Cir. 1997). Hunt has not presented an argument persuasive enough to overcome that deference.

## B. Conspiracy to Commit Health Care Fraud

Hunt's conspiracy conviction is supported by sufficient evidence because there was circumstantial evidence that Hunt and Noble tacitly agreed to defraud Medicare and private insurance. A conspiracy charge requires the Government to "prove an agreement between two or more persons to act together in committing an offense, and an overt act in furtherance of the conspiracy." *United States v. Crossley*, 224 F.3d 847, 856 (6th Cir. 2000) (quoting *United States v. Milligan*, 17 F.3d 177, 182 (6th Cir. 1994)). The Government need not show a formal written agreement. *See id.* Instead, it is sufficient to demonstrate a tacit or mutual understanding among the parties. *See id.* (quoting *United States v. Ables*, 167 F.3d 1021, 1031 (6th Cir. 1999)). Likewise, direct evidence of the conspiracy is not necessary. It is enough to present "[c]irumstantial evidence which a reasonable person could interpret as showing participation in a common plan . . . ." *Id.* (citing *Ables*, 167 F.3d at 1031).

A chain of reasonable inferences leads to the rational conclusion that Hunt tacitly agreed to sign orders for patients he had never examined so that he and Noble could submit bills for their services to Medicare and private insurance. First, the evidence supports a finding that Hunt knew Noble was billing Medicare and private insurance and that the orders needed to be signed by a physician in order for those bills to be paid. Hunt explicitly admitted that he knew that Noble was billing private insurance, and he also admitted that he saw the Medicare patients' Medicare cards because they were attached to the forms that the patients had filled out. It is hard to imagine what Hunt thought Noble was doing with the patients' Medicare cards if not billing for the tests. Based on the previously reached conclusion that a rational jury could determine that Hunt knew that neither he nor a nurse practitioner had examined the patients, it is rational to conclude that Hunt understood that his role was to sign the orders so that Noble could get paid for tests that had not been validly ordered. Therefore, a rational trier of fact could come to the conclusion that Hunt tacitly agreed to a fraudulent scheme and then committed an overt act in furtherance of it by ordering the tests. Hunt's membership in the conspiracy is supported by the fact that he signed the orders after the tests had been performed, and by the fact that Noble paid him $10 per signature.

## C. False Statements Relating to Health Care Matters

To establish guilt under 18 U.S.C. § 1035 for making false statements relating to health care matters, the Government must prove that the defendant knowingly and willfully made false statements or representations "'in connection with the delivery of or payment for health care benefits, items, or services' and in a 'matter involving a health care benefit program.'" *United States v. Canon*, 141 F. App'x 398, 405 (6th Cir. 2005) (quoting 18 U.S.C. § 1035(a)(2)). As the foregoing analysis demonstrates, a rational jury could conclude that Hunt knowingly and willfully made false representations of the medical necessity of the tests by signing orders without actually examining the patients or truly determining that the tests were medically necessary. Moreover, the jury could reasonably conclude that he made those misrepresentations so that Noble's company could receive payment. Thus, it would be reasonable for a jury to find that the misrepresentation occurred in connection with the payment for health care benefits. The foregoing analysis also demonstrates that Hunt fraudulently submitted claims to Blue Cross/Blue Shield under a consultation code requiring a face-to-face examination of the patient when no such examination had occurred. Therefore, a rational jury could also find that Hunt knowingly and willfully made false statements in order to obtain payment from Blue Cross/Blue Shield for services that he did not perform.

V.

The district court's restitution order was not an abuse of discretion in this case. Hunt argues that the district court erroneously calculated the amount of restitution that he owes. We review such a challenge for abuse of discretion. *See United States v. Guardino*, 972 F.2d 682, 686 (6th Cir. 1992). An abuse of discretion occurs when the reviewing court is left with the "definite and firm conviction that the trial court committed a clear error of judgment." *Dubay v. Wells*, 506 F.3d 422, 431(6th Cir. 2007) (quoting *Revis v. Meldrum*, 489 F.3d 273, 280 (6th Cir. 2007)).

The district court properly ordered Hunt to pay restitution in the full amount of the losses that he caused Medicare and Blue Cross/Blue Shield to suffer. District courts are required to order restitution in the full amount of each victim's loss. *See* 18 U.S.C. § 3664(f)(1)(A). The term "victim" is defined as "a person directly and proximately harmed" by a defendant's offense." 18 U.S.C. § 3663A(a)(2). Because Medicare and Blue Cross/Blue Shield would not have paid for the tests but for the presence of Hunt's signature on the orders, Hunt was the direct and proximate cause of the harm suffered by those entities. The district court was therefore correct to order Hunt to pay restitution to those entities in the full amount of the losses that he caused. Hunt does not question the district court's calculation of the losses sustained by Medicare and Blue Cross/Blue Shield, nor does he argue that he should not have to pay restitution at all. Instead, he claims that he should only have to make restitution for the $7,678.88 that he personally received from Blue Cross/Blue Shield. That argument is plainly wrong because the statute says that Hunt must pay restitution for all of the losses that he caused, not simply the losses that wound up in Hunt's own pocket.

In addition, the district court was within its discretion to order Hunt to pay $50,000 of the restitution within 60 days. Section 3664(f)(2) provides that once the amount of restitution has been determined, the district court shall specify "the manner in which, and the schedule according to which, the restitution is to be paid . . . ." Section 3664(f)(2)(A) requires the district court in making that determination to take into account the financial resources of the defendant. Therefore, it was not, as Hunt contends, an abuse of discretion for the district court to order him to pay $50,000 within 60 days based on the fact that he has substantial financial resources.

Moreover, the district court did not abuse its discretion by ordering joint and several liability. In cases involving multiple defendants, § 3664(h) explicitly gives district courts discretion as to whether they should apply joint and several liability or whether liability should be apportioned among the defendants based on their economic circumstances and their respective contributions to

the victims' losses. There is nothing to suggest that the district court abused its discretion by ordering joint and several liability in this case.

## VI.

Lastly, although the question is close because of the limited abuse-of-discretion review prescribed by *Gall v. United States*, __ U.S. __, 128 S. Ct. 586, 597 (2007), the Government is correct that Hunt's sentence is substantively unreasonable. A district court imposes a substantively unreasonable sentence, and thereby abuses its discretion, when it bases the sentence on impermissible factors, *see United States v. Brown*, 501 F.3d 722, 724 (6th Cir. 2007), and it appears that the district court may have done that in relying on indications that Hunt was not guilty as found by the jury.

The district court appears to have relied in substantial part on its doubt that Hunt intended to commit fraud. If the district court did so rely, then it is necessary for us to remand under the abuse-of-discretion scope of review. This is because it would be improper for the judge in sentencing to rely on facts directly inconsistent with those found by the jury beyond a reasonable doubt. Indeed, we have stated repeatedly, albeit outside the sentencing context, that a district court abuses its discretion when it relies on clearly erroneous facts. *See Black Law Enforcement Officers Ass'n v. City of Akron*, 824 F.2d 475, 479 (6th Cir. 1987) (citing *Christian Schmidt Brewing Co. v. G. Heileman Brewing Co.*, 753 F.2d 1354, 1356 (6th Cir. 1985)). And a factual determination is necessarily clearly erroneous where a jury has previously found to the contrary beyond a reasonable doubt. Nothing in § 3553(a) suggests that Congress intended that sentencing judges should rely on a defendant's innocence when the defendant has already been found guilty beyond a reasonable doubt. Moreover, it does not matter that the district court relied on a number, even a large number, of relevant facts in its sentencing, if it also relied on facts that it could not properly consider. Thus we would not hesitate to reverse a sentence if a judge relied on numerous relevant facts but also relied, for instance, on the morning's horoscope.

The following give an indication that the district court relied in part on the defendant's not having had an intent to defraud in this case, a conclusion contrary to the jury verdict.

The court stated an "overarching impression" that defendant "might well have not been convicted by a jury" had it not been for the presence of Mr. Noble in the case. J.A. 809.

The court also stated that Hunt

> first of all, was hoodwinked by Mr. Noble, second of all was naive, third of all was trusting, fourth of all was unknowledgeable about the business part of the practice like many, many doctors and other healthcare professionals are, but most of all was motivated to do this because he thought it was a good test, and he thought that it would detect some things that would be helpful for people to detect.

J.A. 811. While this excerpt could be read as limited to a consideration solely of Hunt's motives for the crime, there is an unmistakable conveyance of the idea that Hunt did not have the intent to defraud.

The court also stated,

> There were many things that Dr. Hunt testified gave him a measure of comfort about what Mark Noble was doing, that militated against his having fraudulent intent.

The jury found he had fraudulent intent, but the court can certainly consider those things in sentencing *despite the jury's finding*.

J.A. 816-17 (emphasis added).

The court also stated that Hunt's "background would not lead one to believe that he would jeopardize his medical license by knowingly committing a fraud from which he made very little money." J.A. 818.

These statements, in the context of the general tenor of the district court's remarks, see J.A. 813-18, certainly permit—if they do not require—the conclusion that in sentencing the district court relied in part on the absence of fraudulent intent on the part of the defendant.

It is true that the district court also relied on a number of factors that were either proper or arguably proper, such as how little money the defendant made off the scheme, the allegedly limited amount of harm to patients, the personal circumstances of the defendant, the effect on the defendant of losing his license, and how valuable the defendant was to the community. But such arguably proper reliance does not cure actual reliance on the perceived innocence of the defendant, any more than in the horoscope example above.

The defendant here has been excused from any imprisonment, despite a Guidelines range of 27 to 33 months. That fact alone, as the Supreme Court's recent holding in *Gall* makes clear, is not enough to conclude that the sentence is unreasonable. The Court in *Gall* moreover directs us to accord great deference to district court sentencing determinations under the abuse of discretion standard. But if the standard of review is to have any teeth, it has to require at least a remand where the district court appears to have relied upon factors that cannot be legitimately relied upon. This case is unlike the particular facts of *Gall* because Gall's lenient sentence was not based on the district court's consideration of Gall's lack of culpability. Instead, the district court in *Gall* merely considered numerous facts indicating that Gall had redeemed himself since the time of his offense. *See Gall*, 128 S. Ct. at 593. The district court in *Gall* did not appear to rely on a consideration that Gall was innocent of the crime for which he stood convicted.

## VII.

For the foregoing reasons, Russell Wayne Hunt's convictions are AFFIRMED, his sentence is VACATED, and the case is REMANDED.

---

**CONCURRING IN PART, DISSENTING IN PART**

---

BOYCE F. MARTIN, JR., Circuit Judge, concurring in part and dissenting in part. I concur in the majority with respect to everything but the reversal of Hunt's sentence. Because I believe the majority is in conflict with the Supreme Court's recent decision in *Gall v. United States*, 128 S. Ct. 586 (2007), I respectfully dissent from its reversal of Hunt's sentence.

I.

The majority holds that it was substantively unreasonable for the district court to rely on an impermissible factor in determining Hunt's sentence. The impermissible factor the majority hangs its hat on is what it has termed Hunt's "innocence." This is the majority's mis-labeling of the fact that the district court found Hunt to be less culpable than other defendants involved in the fraudulent scheme and that the evidence against him was objectively weaker than that against other defendants. The district court did not rely on his "innocence;" Hunt was found guilty by a jury and that conviction will stay with him for the rest of his life. Instead, after a thorough and thoughtful analysis of the § 3553(a) factors, the district court found Hunt less culpable and sentenced him accordingly. That is not impermissible, and tellingly, the majority is unable to point to a single sentencing case in support of its holding.

The majority's mischaracterization of the district court's reasoning avoids the Supreme Court's holding in *Gall*, and this Court's own recent decision in *United States v. Grossman*, --- F.3d ----, No. 06-2310 slip op., 2008 WL 160612, at *4 (6th Cir. Jan. 18, 2008), both of which mandate that we give due deference to reasoned and reasonable sentencing decisions of district courts even when we, as an appellate court, may have chosen a different sentence. Instead of abiding by this clear standard of review, the majority has concocted a new impermissible factor which renders Hunt's sentence substantively unreasonable. But this mischaracterization of the district court's reasoning does not stand up to careful scrutiny.

The Supreme Court recently laid out the proper manner in which a district court should sentence a defendant. *Gall*, 128 S. Ct. at 596-97. Procedurally, the district court must properly calculate the guidelines range, *id.* at 596, give "both parties the opportunity to argue for whatever sentence they deem appropriate," *id.*, and consider "all of the § 3553(a) factors to determine whether they support the sentence requested by the parties," *id.* A district court must then "make an individualized assessment based on the facts presented," *id.* at 596-97, regardless of whether the sentence is above, below, or within the guidelines, *id.* After *Gall*, the calculation and analysis of the correct guidelines range is merely one of the several factors to be considered, *id.*; *see also* 18 U.S.C. § 3553(a), and is not controlling or determinative of the sentence given. Finally, after deciding on a sentence, a district court is required "to adequately explain the chosen sentence," *Gall*, 128 S. Ct. at 597, "[r]egardless of whether the sentence imposed is inside or outside the Guidelines range . . . ," *id.*

Because the majority has focused on the district court's reliance of what it has termed an impermissible factor under § 3553(a), I will carefully lay out the analysis undertaken by the district court under the § 3553(a) factors in reaching its sentencing decision. After doing so, I believe it is patently obvious that the district court did not rely on an impermissible factor, but rather merely found Hunt less culpable than other defendants and sentenced him accordingly.

I begin with the first factor under § 3553(a), "the nature and circumstances of the offense and the history and characteristics of the defendant." The district court found that Hunt's prosecution

and conviction was driven by his co-defendant who pled guilty and whose actions were far more egregious. The district court struggled with Hunt's motive for the crime given the dearth of evidence regarding his criminal intent. He made very little money ($11,000) off of the scheme when compared to his overall practice which made several hundred thousand dollars a year. The district court found that Hunt was hoodwinked by his co-defendant Mark Noble, the ring-leader of the fraudulent scheme who the court termed "a snake-oil salesman, a medicine man." The district court found Hunt to be naive, overly trusting, and unknowledgeable about the business part of the practice. The district court also found that the evidence was very weak regarding Hunt's fraudulent intent. The district court also found that Hunt's actions caused no harm to any patients, and in fact may have been beneficial to several patients. The district court took into account Hunt's history and found he had a humble background, was the first person in his family to attend college, and that he had developed a successful practice. The district court took into account his character and found that his patients and other doctors have a very high opinion of him. The district court also found helpful several letters from members of the community written on Hunt's behalf stating that he was a holistic preventive doctor who believed in the tests at issue and thought they were beneficial.

With regard to the second factor under § 3553(a), the district court stated the sentence must reflect the seriousness of the offense, must promote respect for the law, must provide a just punishment, must protect the public from further crimes, and it must provide the defendant with needed education or vocational training. The district court then took into account that Hunt would not be able to practice medicine in the foreseeable future. The district court found that losing his license alone provided a just punishment, promoted respect for the law, and protected the public from further crimes.

The district court also satisfied § 3553(a)(3) - (5) by correctly calculating the recommended guidelines range. The district court then stated that "[t]he court under the present system takes into account the sentencing guideline. The sentencing guideline in this case in the context of all the factors that I have said is not an appropriate sentence for Dr. Hunt."

The district court also took into account § 3553(a)'s admonition that district court's "avoid unwarranted sentence disparities among defendants," finding that other doctors conducting the same activities as Hunt received pretrial diversion in one instance (Dr. Bartee) and received nothing in other instances (Dr. Moore and Dr. Adams). The district court noted that several other more culpable individuals were not prosecuted at all, including individuals who profited much more from the enterprise than Hunt.

The district court stated that it felt it was important that Dr. Hunt practice medicine again because he was an asset to the community and provided a valuable resource to his patients. The district court stated that while his twelve felony convictions may preclude him from ever practicing again, the probationary sentence may help.

I fail to see, in all of the above reasoning given by the district court in its analysis of the § 3553(a) factors, where the district court took into account Hunt's "innocence." In fact, the district court explicitly stated that despite Hunt's "explanations for his behavior, . . . there's no excuse for the behavior." The district court went further, stating that "[t]here were enough violations . . . that the court cannot find that [Hunt] was totally innocent of any knowledge." These statements indicate that the district court did not impermissibly consider Hunt's "innocence." What the district court did do was take into account several mitigating factors and settle upon an individualized sentence, something that has been done in sentencing for more than three centuries. *See United States v. Phinazee*, --- F.3d ----, No. 06-5730 Slip op., 2008 WL 320774, at *13 (6th Cir., Feb. 7, 2008) (Merritt, J., dissenting).

When the majority's mis-labeling of the district court's reasoning is set aside, I believe that the Supreme Court's decision in *Gall*, and this Court's recent holding in *United States v. Grossman*, --- F.3d ----, No. 06-2310 slip op., 2008 WL 160612, at *4 (6th Cir., Jan. 18, 2008), directly control and require that this Court affirm Hunt's sentence. The similarities between *Gall* and the present case are striking. In both cases, a district court exercised its legal authority to sentence outside the recommended guidelines range, and in both cases, sentenced the defendant well below the guidelines range to probation. *Gall v. United States*, 128 S. Ct. 586, 593 (2007). In both cases, the district court committed no significant procedural errors. Both correctly calculated the applicable guidelines range, allowed both parties to present arguments in support of what they believed to be appropriate sentences, considered all of the § 3553(a) factors, and thoroughly documented their reasoning behind the sentence imposed. *Id.* at 598.

In *Gall*, the district court sentenced the defendant to a term of probation after he pled guilty to being a part of a conspiracy to distribute ecstasy, cocaine, and marijuana. Gall's plea agreement stipulated that he was "responsible for, but did not necessarily distribute himself, at least 2,500 grams of [ecstasy], or the equivalent of at least 87.5 kilograms of marijuana." *Id.* at 592. The presentence report recommended a guidelines range of 30 to 37 months' imprisonment. The district court decided to depart from the guidelines range and sentenced Gall to 36 months of probation. In support of this sentence, the district court stated that "considering all the factors under [§ 3553(a)], the Defendant's explicit withdrawal from the conspiracy almost four years before the filing of the indictment, the Defendant's post-offense conduct, especially obtaining a college degree and the start of his own successful business, the support of family and friends, lack of criminal history, and his age at the time of the offense conduct, all warrant the sentence imposed, . . . ." *Id.* at 593. The district court emphasized that Gall had voluntarily withdrawn from the conspiracy after seven months and that two of his co-conspirators, who had been sentenced 30 and 35 months' imprisonment respectively, had not withdrawn from the conspiracy. The fact that he was less culpable than his co-conspirators, despite his guilty plea, coupled with the overwhelming evidence in support of mitigation, led the district court to sentence Gall to probation. I fail to see how the district court's determination in *Gall* is any different than the district court's decision in this case that Hunt be sentenced to a term of probation given his minor role in the fraudulent scheme and the similarly overwhelming evidence in support of mitigation.

The most damning similarity between this case and *Gall* is the fact that a circuit court of appeals has substituted what it believes to be the appropriate sentence instead of giving "due deference to the District Court's reasoned and reasonable decision that the § 3553(a) factors, on the whole, justified the sentence." *Id.* at 602. The Eighth Circuit reversed the district court in *Gall*, holding, among other things, that the district court gave too much weight to Gall's withdrawal from the conspiracy. *Id.* at 594. This sort of reasoning sounds eerily similar to that used by the majority in the present case: "A district court imposes a substantively unreasonable sentence, . . . when it bases the sentence on impermissible factors, . . . and the district court appears to have done just that in relying on indications that Hunt was not guilty as found by the jury." The majority obviously disagrees with the weight the district court gave to the sparsity of evidence concerning Hunt's intent to defraud. But it was exactly this type of appellate review that the Supreme Court attempted to stamp out in *Gall*. The Supreme Court explicitly stated that even where "[t]he Court of Appeals clearly disagree[s] with the District Judge's conclusion that consideration of the § 3553(a) factors justified a sentence of probation, . . . it is not for the Court of Appeals to decide *de novo* whether the justification for a variance is sufficient or the sentence reasonable." *Id.* at 602. Our own Circuit has re-emphasized this deferential standard of review in *Grossman*, holding that we must give "due deference to the sentencing judge's on-the-scene assessment of the competing considerations, which is to say, not just abuse-of-discretion review to the reasonableness of a sentence but abuse-of-discretion review to the district court's determination that there is a legitimate correlation between the size of the variance and the reasons given for it . . . ." 2008 WL 160612, at *3.

The majority has ignored the proper deferential standard of review and invented a new impermissible factor, "innocence," which will now allow appellate courts to reverse sentencing decisions regardless of whether an analysis of the § 3553(a) factors indicates that a defendant is less culpable than others and that a sentence outside the guidelines is more appropriate. On remand, I hope the district court makes clear that it was not relying on Hunt's "innocence" when it sentenced him to probation, but was instead making a "reasoned and reasonable" decision that a term of probation was "sufficient, but not greater than necessary, to comply with the purposes" of § 3553(a), and imposes the same sentence, supported by the same detailed analysis.

## II.

This case is an example of the perfect storm developing over the sentencing judges in this Circuit. As I have pointed out repeatedly, the struggle we have in the review of sentencing is to determine what was intended by the district court. All too often insufficient explanation is given to allow us to adequately review a district court's sentencing decision. In the present case, the sentencing judge gave us an extensive explanation of her reasoning, yet the majority not only rejects the district court's reasonable explanation as unreasonable, but finds that the sentence in this case was an abuse of discretion. Such a holding completely disregards this Circuit's decisions in *Grossman* and *Vonner*, and also disregards the Supreme Court's decisions in *Gall*. I am unhappy to report that we have once again begun the slippery slope of agreeing with district court's who depart upward on the basis that they were reasonable and did not abuse their discretion, but when a judge decides to sentence below the non-binding guidelines, then we reverse and remand. In my view, this not only does not make sense, but is unprincipled. I am haunted by the words of the 19th century poet Matthew Arnold which sums up so much of the problems we face today with sentencing:

> "For the world which seems
> to lie before us like a land of dreams,
> so various, so beautiful, so new,
> Hath really neither joy, nor love, nor light,
> Nor certitude, nor peace, nor help for pain;
> And we are here as on a darkling plain
> Swept with confused alarms of struggle and flight,
> while ignorant armies clash by night."

*Dover Beach*, 1851.

Based on the foregoing reasons, I respectfully dissent from the majority's reversal of Hunt's sentence.